[No. B157413. Second Dist., Div. Seven. Sept. 16, 2003.]

In re ANGELA M., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
ANGELA M., Defendant and Appellant.

**COUNSEL**

Jeralyn B. Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Jaime L. Fuster and Douglas L. Wilson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**PERLUSS, P. J.**—Angela M. appeals from the juvenile court's February 28, 2002 order committing her to the California Youth Authority (CYA) following a finding that she had violated various terms and conditions of her probation. She contends the court abused its discretion when it ordered CYA commitment and that it erred in failing to make findings regarding her educational needs. We affirm the order of commitment but remand the matter to the juvenile court for a determination whether a special needs evaluation should be conducted.

### FACTS AND PROCEDURAL BACKGROUND

In May 1999 then 14-year-old Angela was reported to school authorities by a fellow student for possessing narcotics on campus. Angela later threatened the student. A delinquency petition was filed on July 13, 1999, alleging Angela had made criminal threats against the student. Angela admitted the allegation and was declared a ward of the juvenile court. The court ordered her home on probation. Angela admitted violating the terms of her probation on several occasions in 2000. She was ultimately removed from her home and placed in an appropriate facility.

On July 28, 2000, Angela ran away from the court-ordered placement and an arrest warrant was issued. Following her detention by police, a new delinquency petition was filed alleging Angela had committed vehicle theft, receiving stolen property and driving without a license. Angela admitted she had received stolen property (a car) and the court sustained the petition as to that count. Angela was ordered to remain a ward of the court and placed in the community camp program.

In April 2001 Angela was released on furlough and placed on home supervision. She again repeatedly violated the terms of her probation. In June 2001 her furlough was revoked and she was returned to camp. Following her release, Angela continued to violate the terms of her probation. A supplemental petition filed September 20, 2001, alleged Angela had violated her probation by ignoring her curfew, missing school, and failing to meet with her probation officer. The petition requested the court consider placing Angela at the Dorothy Kirby Center (DKC), a secure facility, because she had failed

in open facilities. Angela refused to appear in juvenile court and a no-bail warrant was issued for her arrest. She was taken into custody on November 30, 2001.

At the probation revocation hearing the probation officer testified that, while on furlough, Angela had left home several times for protracted periods. Angela often associated with young men her mother characterized as gang members and violated her curfew. Her school attendance was poor. When Angela did attend, she was so disruptive she was ultimately expelled. She also missed scheduled appointments with her probation officer. Since filing the petition, the probation officer learned that Angela had tested positive for methamphetamine and was hospitalized at one point after overdosing on narcotics.

Angela testified on her own behalf and admitted the petition's allegations. Angela explained she had been using methamphetamines on a daily basis since she was 14 years old and also regularly sold methamphetamines supplied to her by friends who were gang members. Angela testified that, since her arrest, she was drug-free, attending school daily in juvenile hall and earning "A" and "B" grades.

The probation officer recommended Angela be committed to the CYA based on her repeated failures at various placements and because "all resources at the county juvenile level were exhausted." DKC was no longer an option because its screening committee had rejected Angela as ineligible. The probation officer testified he had contacted officials at CYA Ventura School for Girls, who concluded Angela could be immediately placed in its mental health program, which offered intensive 12-month drug treatment.

Dr. Haig J. Kojian, a court-appointed psychologist who evaluated Angela and submitted a report to the court,[1] expressed a contrary view, recommending Angela be placed in a psychiatric/treatment-based facility rather than CYA. As a provisional diagnosis he opined Angela's "principal problem" was "extensive drug use," which may have been an "attempt on her part to self-medicate" chronic symptoms of bipolar disorder or attention deficit hyperactivity disorder (ADHD). He concluded Angela required "aggressive intervention, primarily in a drug-rehabilitation facility." Additionally, he indicated that she should "be assessed to determine if trials on mood stabilizing medication would help her control symptoms of hyperactivity, hypo-mania, fidgetiness, racing thoughts, and insomnia." Dr. Kojian also reported "she must undergo an IEP [Individualized Education Program]" assessment.

---

[1] At the disposition hearing the court indicated it had read and considered Dr. Kojian's report, as well as the probation officer's reports.

At the conclusion of the hearing, the juvenile court determined Angela had violated her probation and sustained the petition. The court found Angela had failed on probation at the local level in open placements and had continued to reoffend. The court observed Angela is a "drug addict" and her "addiction is profound." Furthermore, her testimony and behavior demonstrated "she is entrenched in the gang lifestyle." The court concluded this combination of drug addiction and gang entrenchment was best addressed by the 12-month intensive program at the CYA, which also treats mental health problems. Accordingly, the court ordered Angela committed to the CYA.

## DISCUSSION

### 1. *Angela's Commitment to the CYA Was Not an Abuse of Discretion*

■ The appellate court reviews a commitment decision for abuse of discretion, indulging all reasonable inferences to support the juvenile court's decision. (*In re Robert H.* (2002) 96 Cal.App.4th 1317, 1329–1330 [117 Cal.Rptr.2d 899]; *In re Asean D.* (1993) 14 Cal.App.4th 467, 473 [17 Cal.Rptr.2d 572].) Nonetheless, there must be evidence in the record demonstrating both a probable benefit to the minor by a CYA commitment and the inappropriateness or ineffectiveness of less restrictive alternatives. (*In re Pedro M.* (2000) 81 Cal.App.4th 550, 555 [96 Cal.Rptr.2d 839]; *In re Teofilio A.* (1989) 210 Cal.App.3d 571, 576–577 [258 Cal.Rptr. 540].) A CYA commitment may be considered, however, without previous resort to less restrictive placements. (*In re Asean D.,* at p. 473; *In re Tyrone O.* (1989) 209 Cal.App.3d 145, 151 [257 Cal.Rptr. 134].)

Angela contends the juvenile court abused its discretion by committing her to CYA because the court erroneously concluded she was not eligible for DKC placement. Angela asserts the screening committee report states she was found unsuitable for DKC "primarily" because she lacked appropriate psychiatric "Axis-V diagnosis." Angela notes Dr. Kojian made an "Axis-V diagnosis" and suggests the screening committee must not have seen it. She urges us to remand the case and order the juvenile court to have DKC reevaluate her placement in light of Dr. Kojian's diagnosis.

Contrary to Angela's claim, she was not rejected by DKC "primarily" for lack of an appropriate psychiatric "Axis-V diagnosis." The absence of the diagnosis was only one of six enumerated reasons for the screening committee's conclusion. The committee also determined Angela was not motivated for treatment, was too aggressive and impulse driven and needed a structured behavior modification approach prior to group therapy. The committee made the additional comment that Angela was "too defiant, gang entrenched, and uncooperative for any chance of succeeding at DKC."

The juvenile court was well aware of DKC's program and Angela's lack of amenability to treatment at this facility. From the screening committee's comments, the probation officer's testimony and Angela's demeanor and testimony, the court reasonably concluded DKC could not accommodate her needs.

Moreover, the rest of the record before the juvenile court essentially compels CYA commitment. Angela was a very troubled 17 year old at the time of disposition. The court committed her to the CYA only after carefully considering her lengthy drug history, heavy gang involvement, criminal record, behavioral problems, numerous probation violations and repeated unauthorized absences from placements. DKC was unavailable to Angela, and placement was not a realistic option. Commitment to the CYA in this case was not an abuse of discretion.

### 2. *Remand Is Necessary To Permit the Juvenile Court To Make Proper Findings Regarding Angela's Educational Needs*

Education Code section 56000 declares that "all individuals with exceptional needs have a right to participate in free appropriate public education ...." "Individuals with exceptional needs" includes any child who is "[i]dentified by an individualized education program [IEP] team as a child with a disability," as defined by the Individuals with Disabilities Education Act (20 U.S.C. § 1400 et seq.),[2] whose impairment "requires instruction, services, or both which cannot be provided with modification of the regular school program" and who meets certain other prescribed eligibility criteria. (Ed. Code, § 56026, subds. (a), (b), (c) & (d).)[3] A child qualifies as an

---

[2] The Individuals with Disabilities Education Act, commonly known as IDEA, requires states that receive federal funding for special education programs in elementary and secondary schools to adopt and enforce a policy that assures all children with disabilities the right to a free, appropriate public education. (20 U.S.C. § 1412(a)(1).) IDEA defines "child with a disability" as a child "(i) with mental retardation, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance ..., orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and [¶] (ii) who, by reason thereof, needs special education and related services." (20 U.S.C. § 1401(3)(A).) An "individualized education program" is a written statement of a child's present level of educational performance, including, among other information, how the disability affects the child's participation in appropriate activities, a statement of measurable annual goals, benchmarks, and short-term objectives, a statement of the special education and related services the child will receive, and a statement of the extent to which the child will not participate in regular education programs. (20 U.S.C. § 1414(d)(1)(A).)

[3] Education Code section 56026, subdivision (e), limits this broad definition of a child with exceptional needs by the following exclusion: "Unless disabled within the meaning of subdivisions (a) to (d), inclusive, pupils whose educational needs are due primarily to limited English proficiency; a lack of instruction in reading or mathematics; temporary physical

individual with exceptional needs if the IEP team determines "the degree of the pupil's impairment ... requires special education in one or more of the program options authorized by Section 56361 of the Education Code." (Cal. Code Regs., tit. 5, § 3030.)

■ California Rules of Court, rule 1493(e)(5)[4] implements this legislative mandate to provide free special education services to all eligible children by directing that the juvenile court, when declaring a child a ward of the court, "must consider the educational needs of the child ...."[5] Accordingly, prior to committing Angela to the CYA, the juvenile court had a duty to consider or determine whether Angela had special educational needs.[6]

The juvenile court in this case was clearly on notice that Angela may have special educational needs. Dr. Kojian concluded she was suffering from bipolar disorder that "may have been affecting this young lady for some time, and preventing her from maintaining stable functioning in the community" and believed she may also be experiencing symptoms associated with

---

disabilities; social maladjustment; or environmental, cultural, or economic factors are not individuals with exceptional needs."

[4] At the time of Angela's disposition hearing this provision was found in California Rules of Court, rule 1493(d)(5). The rule was renumbered without substantive change ("must" replaced the equally mandatory "shall") effective July 1, 2002.

[5] This mandate to California's juvenile courts is also incorporated in Standards of Judicial Administration Recommended by the Judicial Council, which provide that the juvenile court should "(1) Take responsibility, with the other juvenile court participants at every stage of the child's case, to ensure that the child's educational needs are met, regardless of whether the child is in the custody of a parent or is suitably placed in the custody of the child welfare agency or probation department and regardless of where the child is placed in school. Each child under the jurisdiction of the juvenile court with exceptional needs has the right to receive a free, appropriate public education, specially designed, at no cost to the parents to meet the child's unique special education needs.... [¶] (2) Provide oversight of the social service and probation agencies to ensure that a child's educational rights are investigated, reported, and monitored.... A child who comes before the court and is suspected of having exceptional needs or other educational disabilities should be referred in writing for an assessment to the child's school principal or to the school district's special education office. [Citations.]" (Cal. Stds. Jud. Admin., § 24(h).)

[6] ■ When a ward of the court is committed to the CYA, part of the treatment and rehabilitative process is to provide the child with an appropriate education, which necessarily includes an awareness of and services for any special educational needs. (See Welf. & Inst. Code, § 1742 ["When the juvenile court commits to the Youth Authority a person identified as an individual with exceptional needs, ... the juvenile court ... shall not order the juvenile conveyed to the physical custody of the Youth Authority until the juvenile's individualized education program previously developed pursuant to Article 3 (commencing with Section 56340) of Chapter 4 of Part 30 of Division 4 of Title 2 of the Education Code for the individual with exceptional needs, has been furnished to the Department of the Youth Authority."].)

ADHD.[7] Indeed, Dr. Kojian specifically recommended that Angela "undergo an IEP"—that is, that she be evaluated by education professionals to determine whether she had special educational needs.

We cannot agree with the People that Angela's drug addiction and defiance are separable from her learning process and that the programs at the CYA will necessarily address her educational needs without an IEP. Although Angela's learning improved in juvenile hall, she testified the change resulted only because she was permitted to work alone, outside the classroom. Moreover, Dr. Kojian's report plainly indicates additional information is needed before a proper determination of Angela's educational needs can be made.

Although the record indicates special attention to Angela's education needs was appropriate, the juvenile court did not mention this issue when committing her to the CYA. Remand is necessary to permit the juvenile court to make proper findings, on a more fully developed record, regarding Angela's educational needs.[8]

## DISPOSITION

The matter is remanded to the juvenile court with directions to determine whether an evaluation of Angela's special educational needs should be conducted, with the court's findings to be forwarded to the Director of the California Youth Authority in an amended commitment order together with Angela's individualized education program if one is prepared. The order committing Angela to the California Youth Authority is otherwise affirmed.

Johnson, J., and Munoz (Aurelio), J.,* concurred.

---

[7] Dr. Kojian reported, "It is interesting to note that [Angela] experienced the same paradoxical reaction to the street form of amphetamine that she would have to psycho stimulant medications such as Ritalin or Dexedrine had she been prescribed these medications."

[8] In general, once a child is committed to the CYA, supervision of the child's rehabilitation is a function solely for the CYA, not the juvenile court. (*In re Owen E.* (1979) 23 Cal.3d 398, 403–405 [154 Cal.Rptr. 204, 592 P.2d 720]; *In re Allen N.* (2000) 84 Cal.App.4th 513, 515 [100 Cal.Rptr.2d 902] ["Notwithstanding the juvenile court's continuing jurisdiction over a ward, '[c]ommitment to the Youth Authority in particular, brings about a drastic change in the status of the ward which not only has penal overtones, including institutional confinement with adult offenders, but also removes the ward from the *direct supervision* of the juvenile court.' [Citation.]"].) Nonetheless, an order of commitment may be changed or amended by the court if the child's welfare requires the modification. (Welf. & Inst. Code, § 779; see *In re Robert W.* (1991) 228 Cal.App.3d 32, 34 [279 Cal.Rptr. 625].)

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.