Filed 10/31/13  In re K.P. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re K.P., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>K.P.,<br><br>        Defendant and Appellant. | A137361<br><br>(Sonoma County<br> Super. Ct. No. 35960J) |

K.P. appeals from a juvenile court dispositional order committing him to the Department of Corrections and Rehabilitation, Division of Juvenile Justice (now the Division of Juvenile Facilities (DJF).  He seeks a reversal of the order committing him to DJF and a remand to the juvenile court for consideration of placement alternatives and the completion of needed mental health and educational evaluations.  We conclude K.P.'s contentions require neither reversal nor remand to the juvenile court for further proceedings.  Accordingly, we affirm.

1

# FACTS

## A. Background

K.P. first became a ward of the juvenile court at age 14, based on a Welfare and Institutions Code section 602[1] petition, alleging that on June 27, 2010, he had committed offenses constituting an assault with a deadly weapon (knife) (Pen. Code, § 245, subd. (a)(1), and participation in a criminal street gang (Pen. Code, § 186.22, subd. (a)), and, specifically alleging that the assault was committed for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)(B)), that K.P. had personally used a dangerous and deadly weapon (Pen. Code, § 1192.7, subd. (c)(23)), and personally inflicted great bodily injury on the victim (Pen. Code, § 12022.7, subd. (a)). At a jurisdictional hearing, K.P. waived his right to trial and admitted to the charge of felony assault with a deadly weapon, as well as the great-bodily-injury and gang enhancements; the other charge and enhancement were dismissed. At the dispositional hearing held on September 17, 2010, the juvenile court adjudged K.P. a ward of the court and determined that his maximum term of confinement would be 12 years. K.P. was removed from the home of his guardian (his grandmother) and placed in the custody of the probation department. The probation department placed K.P. in a group home on October 14, 2010.

Six months later, on March 22, 2011, the probation department filed a section 777 petition alleging that K.P. had violated probation as a result of his discharge from the group home. K.P. admitted leaving the group home without permission and being discharged from the home. The court continued K.P. as a ward and he was later placed at a teen ranch.

On December 29, 2011, the probation department filed a new section 777 petition alleging that K.P. had violated probation by absconding from the teen ranch. The court dismissed the petition, but continued K.P.'s wardship and returned him to the custody of the probation department. K.P. was returned to the teen ranch.

---

[1] All further unspecified statutory references are to the Welfare and Institutions Code.

### B. Proceedings Leading to DJF Commitment

On May 29, 2012, the probation department filed an amended section 777 petition, alleging that 16-year old K.P. had violated the terms of his probation by his termination from the teen ranch for fighting on the grounds and his arrest for battery as a member of a criminal street gang (Pen. Code, §§ 186.22, 242). After waiving his right to a hearing, K.P. admitted to the allegations in the amended section 777 petition. K.P. was detained in juvenile hall and the matter was referred to the probation department for a disposition report.

On June 14, 2012, the parties appeared in juvenile court. At that time, K.P. was committed to DJF "for a 90-day period of observation and diagnosis" as recommended by the probation department. While detained in juvenile hall, K.P. physically assaulted another resident. The probation department filed a section 777 petition alleging K.P. was again in violation of his probation. The parties appeared in juvenile court on August 3, 2012. After waiving his right to a hearing, K.P. admitted to the assault allegation. The court reissued its order directing a 90-day evaluation at DJF, which was then scheduled to take place the next week.

On August 6, 2012, K.P. arrived at DJF, where he was subjected to an extensive diagnostic evaluation over the next 90 days. DJF members of an interdisciplinary team reviewed the following documents: (1) 6/15/2012 mental health intake assessment by the California Department of Corrections and Rehabilitation; (2) 6/11/2012 Sonoma County probation department report and recommendations; (3) Sonoma County Sheriff's Office Investigative Report; and (4) 07/23/2010 psychological assessment report. The DJF report consisted of a case evaluation, probable causes for K.P.'s delinquent behavior, and DJF's training and treatment services that would be provided to K.P. (gang awareness, decision making/impulse control, academic/vocational services, victims awareness, informal drug program). A DJF "MSW caseworker specialist" described K.P.'s family background, peer associations, community background, academic education, vocational education/work experience, drug/alcohol use and abuse, correctional experience, self-perceptions, and clinical impressions. The DJF staffing team recommended that the court

3

commit K.P. to DJF's Core Program "[d]ue to the services that [K.P.] needs and the numerous previous attempts at placement in less restrictive environments." The recommendation reflected "the collective judgment of staffing team," who believed that DJF commitment was "the least restrictive disposition alternative available to the Juvenile Court that will protect the public and provide needed correctional services for" K.P. The "Clinical Intake Treatment Team" specifically recommended that if K.P. was committed to DJF, he should be placed in "a mental health unit level of care to address his mental health and psychiatric needs," and where " the staff to youth ratio is smaller which [K.P.] appears to have more positive adjustment to." A DJF clinical psychologist submitted a mental health evaluation based on a review of the "field file," clinical interviews with K.P., and the administration of psychological tests, as well as observations of K.P.'s test-taking behavior, by DJF's clinical and professional program staff members, on multiple dates in August, September and October of 2012. K.P. was of average range intelligence and did not meet the specific criteria for the qualification of a youth with disability status used within DJF and there were no significant test responses that provided indications of an acute mental illness process He did not display any significant disorganization of thought or impaired cognitive ability, and test responses were negative for the presence of obvious or overt signs or symptoms of psychotic thought process. However, he was seen as immature and socially apprehensive, and, took required psychiatric medication for the management of his mood and thought process. K.P. seemed to suffer "with periods of confusion or misunderstanding of social interactions (including the expectations of others)," which contributed to his behavioral acting out conduct. The DJF psychologist concluded that K.P. "is not insightful about his past behavior and his judgment is seen as impulsive. His judgment is further impaired by his apparent episodes of misperception (despite the absence of apparent or overt psychotic process being presented in interview) of the motivations of others. His historical gang affiliation further complicates his decision making options and increases his community risk according to the DJF gang coordinator consulted in this matter. [¶] Of particular concern in this case is the youth's pattern of mistrust of authority figures and

4

his episodic apparent misperception of his circumstances which then contributes to unpredictable violence. The youth has repeatedly shown aggressive assault behaviors and while some of which are gang influenced, others are apparently not gang related. While [a psychological] assessment in 2010 recommended outpatient treatment and added 'should he not be found eligible for outpatient treatment, then placement in a residential program is strongly recommended, preferably one with a day treatment component[,]' [t]he reality in 2012 is that the youth has failed in these alternative treatment environments. . . . It is felt that this youth's violence and mental health issues necessitate an incarceration level of care. [¶] The youth's level of dysfunction, violence and unpredictable 'altered states' or decompensation events (which he calls 'black outs') makes him inappropriate for any lower level of community care than he currently is receiving at the Division of Juvenile Justice. This conclusion is based on review of the youth's field file, WIN record and author's clinical interaction with the youth. The youth identifies himself as 'paranoid' and while his testing does not show elevation in this scale reference – it does show significant elevations in the areas of social anxiety/social apprehension." The psychologist recommended that K.P. be placed in a mental health hall at DJF.

Before the dispositional hearing, the probation department officer filed a supplemental disposition report recommending commitment to DJF. The probation department officer noted K.P.'s life had been affected by drug exposure in utero and hereditary mental health issues, which was a formula for a predisposed propensity toward violence and distress. Nevertheless, the probation department officer believed that those factors, while being given special consideration, "should not condone [K.P.'s] unpredictable violence inflicted on others" or "his inability to accept responsibility for his conduct after the fact." The probation department staff felt that K.P. was "far too great of a risk to place in a group home setting and his level of violence and irrationality limits the options available." K.P. "had been afforded all available local services, to no avail, and the level of treatment he require[d] [could] only be administered within a safe and

5

structured setting," and DJF was "equipped to address the minor's current needs and . . . future mental health needs should they become more evident."

On November 16, 2012, the parties appeared in juvenile court for a contested dispositional hearing. The court had reviewed the probation department's recommendation, DJF's diagnostic report, and a letter from K.P. K.P.'s counsel asked the court to place K.P. either in a group home or in "probation camp." Counsel specifically noted that although DJF would provide some mental health treatment, medication, and schooling for K.P., the youth would be an environment in which he would be a target for gang retaliation either as a former gang member or because he had been a member of a rival gang.

The juvenile court followed the recommendations of the probation department and the DJF staff and committed K.P. to DJF for a maximum term of five yeas and 346 days, with credit for 346 days. The court further found K.P. was an individual with exceptional needs and had an individual educational program that would be included in the paperwork sent to DJF. In addressing K.P.'s concerns about DJF, the court commented: "[K.P.] has been in front of me quite a bit. . . . [¶] . . .[W]hen I sent you [for a] diagnostic [evaluation] I told you that you may be challenged to fight and those things would come up. . . ." "So if one was to look at the 90-day diagnostic as a test, [K.P.] did not pass that test. [¶] The Court has afforded you numerous opportunities. Those have not been successful."

## DISCUSSION

K.P. argues the juvenile court's findings that he would probably benefit from DJF commitment and less restrictive alternatives would not be effective, are not supported by substantial evidence and are based on an incomplete social study. According to K.P., the court sent him to DJF without determining and considering the complete picture of his mental health and special education needs; without performing the required assessment of whether his individual rehabilitative and educational needs would be addressed by any actual programs at DJF; and without considering what less restrictive alternatives might

6

be effective and better address his mental health, educational and gang issues.  We conclude K.P.'s arguments are unavailing.

"We review a commitment decision only for abuse of discretion, and indulge all reasonable inferences to support the decision of the juvenile court." (*In re Asean D.* (1993) 14 Cal.App.4th 467, 473.)  Under section 202, "juvenile proceedings are primarily 'rehabilitative' (*id.*, subd. (c)), and punishment in the form of 'retribution is disallowed (*id.*, subd. (e))." (*In re Eddie M*. (2003) 31 Cal.4th 480, 507 (*Eddie M*.).)  But, "[w]ithin these bounds, the court has broad discretion to chose probation and/or various forms of custodial confinement in order to hold juveniles accountable for their behavior, and to protect the public.  ([§ 202], subd. (e).)" (*Eddie M., supra*, at p. 507.)  In making its dispositional choice, the juvenile court here properly focused on "the dual concerns of the best interests of the minor and public protection." (*In re Jimmy P*. (1996) 50 Cal.App.4th 1679, 1684.)

We also conclude there was substantial evidence to support the juvenile court's finding that, "the mental and physical condition and qualifications of [K.P.] [were] such as to render it probable that he [would] be benefited by the reformatory educational discipline or other treatment provided by the" DJF.  (§ 734.)  At the time of the dispositional hearing, K.P. was 17, and had continued his delinquent conduct over a period of two years despite court intervention and placement at one group home and a teen ranch.  A commitment to DJF would provide K.P. with long-term, rehabilitative programs in a structured environment, as recommended by the probation department officer and the DJF staff.  "Where the minor has previously failed in a series of local programs . . . statewide confinement in the structured setting offered by DJF may decisively outweigh other considerations." (*In re Greg F.* (2012) 55 Cal.4th 393, 418; see *In re Martin L.* (1986) 187 Cal.App.3d 534, 544 ["[c]ircumstances in a particular case may well suggest the desirability of a [DJF] commitment despite the availability of . . . alternative dispositions"].)

K.P. argues the matter should be remanded because the juvenile court did not have adequate information to consider his significant mental health and special educational

needs in formulating the appropriate disposition and what services K.P. would actually receive at DJF to address his needs. In support of his argument, K.P. cites several cases that are inapposite. We are not here concerned with a court's failure to consider a current dispositional report (*In re L. S.* (1990) 220 Cal.App.3d 1100, 1107), a court's reliance for disposition on a limited social study prepared for a fitness hearing (*In re Devin J.* (1984) 155 Cal.App.3d 1096, 1101), a court's reliance "on its previous dispositional order purporting to impose 'stayed' or 'suspended' [DJF] commitment" (*In re Ronnie P.* (1992) 10 Cal.App.4th 4th 1079, 1086), or a court's failure to mention the ward's special educational needs (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1399). In this case the juvenile court appropriately relied for disposition on current social study reports, which included comprehensive descriptions of the probable causes of K.P.'s delinquent behavior and the treatment and services needed for his rehabilitation. In its commitment order, the juvenile court directed the probation department to forward a copy of K.P.'s medical records to DJF, indicated that K.P. had been prescribed psychotropic medication, directed that a DJF physician evaluate the medication, and authorized DJF to provide routine medical, dental and mental health treatment to K.P. (See Cal. Rules of Court, rule 5.805(3), (4).[2]) The juvenile court also identified K.P. as "an individual with exceptional needs" and as having an "individualized education program." (See § 1742[3]; Cal. Rules of Court, rule 5.805(5).[4])

---

[2]    California Rules of Court, rule 5.805 mandates, in pertinent part, that if the juvenile court orders the youth committed to DJF, "[t]he court must order the probation department to forward to the [DJF] all required medical information, including previously executed medical releases," and "[i]f the youth is taking a prescribed psychotropic medication, the [DJF] may continue to administer the medication for up to 60 days, provided that a physician examines the youth on arrival at the facility, and the physician recommends that the medication continue." (*Id.*, rule 5.805(3), (4).)

[3]    Section 1742 mandates, in pertinent part, that when the juvenile court commits to DJF a person identified as an individual with exceptional needs, the court shall furnish to DJF the juvenile's individualized education program.

[4]    California Rules of Court, rule 5.805 mandates, in pertinent part, that if the juvenile court commits a youth to DJF, the court "must provide to the [DJF] information

"The [juvenile] court is only required to find if it is probable a minor will benefit from being committed, and the court did so in this case." (*In re Jonathan T.* (2008) 166 Cal.App.4th 474, 486.)  Contrary to K.P.'s contentions, the court was not required to order further evaluations of his mental health or educational deficiencies or specify how a DJF commitment would met his exceptional needs.  Instead, it is DJF's responsibility to determine whether to accept a committed youth because he "can be materially benefited by [DJF's] reformatory and educational discipline, and . . .[it] has adequate facilities, staff and programs to provide that care." (§ 736, subd. (a).)  "To determine who is best served" by DJF and "who would be better served by the State Department of Mental Health," "the Director of the Division of Juvenile Justice and the Director of the State Department of Mental Health shall . . . confer and establish policy with respect to the types of cases that should be the responsibility of each department." (*Id.*, subd. (b).)  Additionally, it is DJF's responsibility to assess the educational needs of the youths accepted to its secured facilities.  Section 1120 mandates that DJF "shall assess the educational needs of each ward upon commitment and at least annually thereafter until released on parole.  The initial assessment shall include a projection of the academic, vocational, and psychological needs of the ward and shall be used both in making a determination as to the appropriate educational program for the ward and as a measure of progress in subsequent assessments of the educational development of the ward." (*Id.*, subd. (b).)  "The educational program of the [DJF] shall be responsive to the needs of all wards, including those who are educationally handicapped . . . ." (*Ibid.*)  The juvenile court could – and this court does – presume that if DJF determines K.P. has special or exceptional needs, such needs will be met.  (Evid. Code, § 664 [presumption that official duty has been regularly performed].)  If K.P. believes DJF is "unable to, or failing to, provide treatment consistent with [s]ection 734," he may seek appropriate relief in the

---

regarding the youth's educational needs, including the youth's current individualized education program if one exists." (*Id.*, rule 5.805(5).)

9

juvenile court.  (§ 779[5]; see *In re Antoine D.* (2006) 137 Cal.App.4th 1314, 1323 [juvenile court may entertain motion to modify or vacate DJF commitment where there is a showing under section 734 that the ward is unlikely to benefit from DJF's education and treatment programs].)

## DISPOSITION

The dispositional order is affirmed.

_____
Jenkins, J.

We concur:

_____
McGuiness, P. J.

_____
Siggins, J.

---

[5]    Section 779 reads, in pertinent part:  "The court committing a ward to the Youth Authority [now DJF] may thereafter change, modify, or set aside the order of commitment. . . . This section does not limit the authority of the court to change, modify or set aside the order of commitment after a noticed hearing and upon a showing of good cause that the Youth Authority [now DJF] is unable to, or failing to, provide treatment consistent with Section 734."