Filed 12/20/13  In re D.B. CA3

# NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re D.B., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>  v.<br><br>D.B.,<br><br>      Defendant and Appellant. | C069919<br><br>(Super. Ct. No. 68612) |

D.B. (the minor) appeals from the juvenile court's jurisdictional order sustaining a petition pursuant to Welfare and Institutions Code section 602, subdivision (a),[1] and the court's dispositional order removing him from the parental home and placing him in the custody of the California Department of Corrections and Rehabilitation, Division of Juvenile Justice (DJJ).  The minor contends the court abused its discretion by failing to order a less restrictive alternative placement.  We conclude there was no abuse of discretion.  The minor's criminal record, failure to take responsibility for his crimes, history of less restrictive alternatives, and the increasing seriousness of his offenses

---

[1]      Undesignated section references are to the Welfare and Institutions Code.

1

support the juvenile court's commitment to DJJ. Accordingly, we affirm the court's order.

FACTUAL AND PROCEDURAL BACKGROUND

The proceedings began in Contra Costa County in 2007 and were transferred to San Joaquin County in 2011.

***Contra Costa County***

In January 2008, after the minor admitted the allegations of an amended section 602 petition that he had committed two misdemeanor batteries, the juvenile court adjudged the minor a ward of the court and placed him on an electronic monitoring program.

On January 28, 2008, the court "downgraded" the minor from electronic monitoring to 90 days on home supervision, including a 26-day commitment to juvenile hall, and imposed various terms and conditions of probation. In March 2008, April 2009, and May 2009, the court found the minor had violated probation, first by failing to test for drugs, then by testing positive for THC, and finally by acts of disrespect toward school staff. The last violation led to a 90-day commitment to the juvenile "[r]anch." In August 2009, the minor violated probation by misconduct at the juvenile ranch, causing the court to add 30 days to his commitment.

In February 2010, a supplemental section 602 petition alleged the minor committed an act of felony vandalism. An amended petition added the allegation that the minor unlawfully disturbed another person with loud and unreasonable noise; the minor admitted that allegation.

In March 2010, the court continued the minor as a ward, placed him on electronic monitoring for 60 days, and ordered "wraparound services," including mental health services and a substance abuse treatment program.

In October 2010 and November 2010, the court found the minor had violated probation by failing to attend school and being suspended, and by removing an electronic

2

transmitter from his ankle. In December 2010, the court committed the minor to 60 days in juvenile hall.

In April 2011, an amended supplemental section 602 petition alleged the minor committed assault with a firearm on Jerome M. (count 1; Pen. Code, § 245, subd. (a)(2)), second degree robbery of Geoffrey D. (count 2; Pen. Code, §§ 211, 212.5, subd. (c)), and assault with a deadly weapon on Geoffrey D. (count 3; Pen. Code, § 245, subd. (a)(1)). As to count 1, it was alleged the minor personally used a handgun (Pen. Code, § 12022.5, subd. (a)(1)) and personally inflicted great bodily injury (Pen. Code, § 12022.7, subd. (a)). In May 2011, a further amendment added count 4, grand theft of property from Geoffrey D. (Pen. Code, § 487, subd. (c)). The minor admitted counts 1 and 4 and the allegations as to count 1.

Because the minor had moved to San Joaquin County, Contra Costa County transferred the cases out. San Joaquin County accepted the transfer in on May 12, 2011. The section 602 petition filed in April 2011 and adjudicated in Contra Costa County in May 2011 became the "transfer-in petition."

### *San Joaquin County*

According to the dispositional report filed in June 2011 by the San Joaquin County Probation Department (the Department), the underlying facts as to the allegations of the transfer-in petition the minor had admitted were as follows:

In the early morning of November 14, 2010, officers responded to a report of shots fired in a residence. At first, the reporting party, S.M., stated her 16-year-old nephew (the minor) had shot her son. She then said the minor had discharged a gun inside the residence but no one was hurt. The officers found blood drops and smears on the floors and walls, a bullet hole in the kitchen wall, and shell casings on the floor. The officers heard stories suggesting the minor had been drinking and was depressed and suicidal.

After learning Jerome M., the victim, had been admitted to a hospital to treat a gunshot wound, the officers interviewed him at the hospital. He stated the minor was

intoxicated and playing loud music around 3:00 a.m.  After arguing with the minor over the music, Jerome M. went back to bed.  The minor tapped on Jerome M.'s bedroom window from outside and told to him come out and finish the argument.  Jerome M. saw the minor was holding a handgun.  Jerome M. went to the kitchen to inform the rest of the family.  The minor entered the kitchen, called Jerome M.'s name, and shot him twice, hitting him in the hip and forearm.  Jerome M. fled to the back of the residence.  The minor left the residence and was not located by the officers.

On April 16, 2011, officers responded to a dispatch call reporting four Black males had assaulted a male victim and stolen his bicycle.  Four suspects, including the minor, were apprehended at the scene.  The officers located the victim, Geoffrey D. (aged 50), and discovered a bleeding laceration on his ear.  The victim stated he was riding his bicycle in his neighborhood when he saw one of the suspects tearing down a sign posted by the victim's neighbor.  The neighbor and the suspects had a verbal confrontation.  When the victim rode closer to the group, one of the suspects jumped on the back of the victim's bicycle, slapped him on the head, and ordered him to surrender the bicycle.  When the victim did not comply, the suspect punched him in the head.  The other suspects, including the minor, joined in the assault.  The suspects got the bicycle away from the victim, but were apprehended before they could leave the scene.  Witnesses supported the victim's story.  The suspects all denied the assault and theft.

In addition to describing the facts of the underlying case and the prior adjudicated petitions, the Department's report noted the minor had received dispositions including home supervision, electronic monitoring, community service, juvenile hall, juvenile ranch, and wraparound services.

According to the report, the minor's father, who had no relationship with the minor, allegedly suffered from severe mental health problems.  The minor's mother claimed to suffer from bipolar disorder, depression, and anxiety.  She believed the minor had unresolved mental health problems and was in a state of "crisis" when he shot

4

Jerome M. She thought he needed to be placed in a structured residential facility such as a group home or boot camp.

The minor admitted he shot Jerome M., but claimed it was unintentional. He would not talk about the alleged bicycle theft. He had a history of being placed in special education and individualized education programs. He denied current use of alcohol or marijuana and said he was not taking any prescribed medications.

The Department recommended committing the minor to DJJ because he had admitted to two felonies, one of them violent and involving gun use, which constituted a section 707, subdivision (b), felony;[2] he had had many prior referrals and probation violations over the last four years; he had failed to rehabilitate during a long term of supervised probation; past sanctions had been ineffective; and the minor had mental health problems that needed to be addressed.

At a hearing on September 26, 2011, the juvenile court denied the minor's request for a court-ordered psychological evaluation as unnecessary for purposes of placement, but indicated the minor could obtain such an evaluation on his own behalf.

On October 19, 2011, Dr. Roger Katz, a psychologist retained by the minor's counsel, submitted a psychological evaluation of the minor. Dr. Katz offered a "working diagnosis" of "conduct disorder of adolescence, alcohol and marijuana abuse, and a mood disorder [not otherwise specified]." He ruled out bipolar disorder, attention deficit hyperactivity disorder, depressive disorder, anxiety disorder, learning or communication disorders, and disorganized or delusional thinking.

---

[2] A finding that a felony comes within section 707, subdivision (b), requires a determination whether the minor is "a fit and proper subject to be dealt with under the juvenile court law," depending on whether the juvenile court concludes the minor would be amenable to the juvenile court's "care, treatment, and training program." If the court determines the minor would not be a fit and proper subject for juvenile court treatment, the court may commit the minor to DJJ in lieu of state prison. (§ 707, subds. (a) - (c).)

Dr. Katz recommended against a commitment to DJJ because "the draconian and stressful nature of this institution could aggravate [the minor's] condition; increase his cynicism, mistrust, and demoralization, and harden him in the long run." Moreover, although the minor "was a juvenile delinquent by any standard definition," he did not rank with "the worst of the worst" among youthful offenders. Dr. Katz proposed instead that the minor, who was "amenable to change with the right type of treatment in the proper setting," receive "comprehensive mental health services that included medication (an antidepressant or a mood stabilizer), psycho-educational counseling, group therapy, and skills training."

However, much of Dr. Katz's evaluation appears to be at odds with these conclusions. He noted the minor's denial of the current charges against him despite compelling evidence, his "lack of remorse," and his "refusal to take any responsibility for his actions" "suggested a weak conscience and an absence of empathy and prosocial values." Dr. Katz stated, "[t]hese were not good prognostic indicators." The minor showed a "guarded" and "detached" affect, with a "somber demeanor" that suggested a "great deal of anger and unhappiness" beneath the surface. He had a low IQ (composite score of 79) and lacked insight into his problems. His crimes were "violent and predatory." Finally, his risk of reoffending was "moderately high" because of "the young age at which he started to get in trouble, the chronicity of his problems despite efforts to rehabilitate him, and the fact that he associated with delinquent peers, abused alcohol, and had mental health issues that were emotionally and behaviorally destabilizing." Even though Dr. Katz did not recommend a DJJ commitment, he acknowledged he had "painted a rather bleak picture of [the minor]."

On December 5, 2011, the minor filed a "supplemental disposition report" that proposed placement in an "appropriate placement facility." This pleading attached numerous exhibits, including the Katz evaluation, a letter and accompanying materials from Charis Youth Center, letters from the minor's mother and the family of Jerome M.,

and documentation of the minor's supposedly minor discipline record in juvenile hall since May 2011. Charis Youth Center, a facility offering residential, educational, and mental health services to "emotionally challenged adolescents," stated it would be willing to consider the minor for placement, but would need more information about him, including an interview, before deciding whether to accept him.

The juvenile court held a contested dispositional hearing on December 5, 2011. James G., the minor's brother, testified that a group home or treatment facility would help the minor because such a facility had helped James G., and the minor had similar emotional and family problems.

The minor also offered in evidence a document titled, "Nineteenth Report of [the] Special Master" (special master's report). This report was originally filed in an Alameda County class action case as part of the ongoing review of DJJ's compliance with "the *Farrell* remedial plans" (not set out within the report, but apparently ordered to remedy DJJ's past deficiencies in caring for minors in its custody). The report discusses a range of areas, including education, disabilities, use of force, and implementation of an integrated behavioral treatment model (IBTM). The report also makes recommendations for improvement. With regard to IBTM, the report concludes: "The most challenging issues that remain in the case reflect the failure of DJJ to have an [IBTM]. Issues such as use of force and implementing effective B[ehavioral] T[reatment] P[lans] are ultimately resolved not by piece meal responses but when the IBTM is a way of life for all DJJ staff. . . . [¶] To make significant progress in implementing the IBTM will require a narrowing of focus for Defendant [DJJ]. Defendant is building constitutional education and health care systems. This has required significant time and energy. Now it is time to refocus the limited time and energy of Defendant to focus primarily on the IBTM. One of the most important reasons to achieve substantial compliance in education, disabilities, dental and medical [care,] is to ensure that the full attention of Defendant can focus on making the mental health systems and sex behavior treatment program integrate with an effective

7

daily management and behavioral system that supports desired change in youth. [¶] It is unfortunate that years were lost in the case defining the behavioral treatment model but now the parties have agreed on a model that is showing great promise. The system is small enough now that full implementation, while challenging, can and must be done. Significant change occurs with consistent focus. The focus in this case must now shift from doing many things to integrating the many things into one unified approach."

The minor's counsel argued the special master's report showed DJJ was an unsatisfactory option for the minor because it had no "behavior treatment models" in place. Counsel asserted the record did not show the minor had received any rehabilitative services up to now, even though such services had been ordered, and many "graduated penalty options" had not been tried. Counsel also stated she was still waiting to hear from possible placements other than Charis Youth Center.

On December 9, 2011, the juvenile court sentenced the minor to serve 10 years and 8 months in DJJ custody. The court stated its sentence considered the twofold purpose of delinquency law: rehabilitation of the minor and the protection of the public. The court expressly found: "The mental and physical conditions of the minor are such as to render it probable that the minor could benefit by the treatment program of [DJJ]." In this connection, the court noted the special master's report expressed "optimism" in DJJ's treatment model "showing great promise."

The juvenile court rejected the minor's request for a less restrictive alternative on the grounds set out in the Department's report: the seriousness of the minor's actions, the number of prior referrals and probation violations incurred over the last four years, the minor's failure to rehabilitate in the time he had been on supervised probation, the ineffectiveness of past sanctions, and the minor's mental health needs. In addition, citing Dr. Katz's findings as to the minor's denial of committing the crimes that had been adjudicated, lack of remorse, refusal to take responsibility for his crimes, weak

8

conscience, and lack of empathy, the court found the minor posed a danger to society and to other youths.

## DISCUSSION

The minor contends the juvenile court abused its discretion by committing him to DJJ because he "had no remarkable serious or violent criminal history with the juvenile justice system prior to the instant case," "[t]he record is devoid of any real evidence that [the minor] will receive and complete the treatment he needs at DJJ," and less restrictive alternative placements were available. We are not persuaded.

In making a sentencing decision under the juvenile court law, the court "shall consider the safety and protection of the public, the importance of redressing injuries to victims, and the best interests of the minor." (§ 202, subd. (d).)

"The appellate court reviews a commitment decision for abuse of discretion, indulging all reasonable inferences to support the juvenile court's decision. [Citations.] Nonetheless, there must be evidence in the record demonstrating both a probable benefit to the minor by a [DJJ] commitment and the inappropriateness or ineffectiveness of less restrictive alternatives. [Citations.] A [DJJ] commitment may be considered, however, without previous resort to less restrictive placements. [Citations.]" (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396.) Indeed, the juvenile court may make such a commitment "in the first instance." (*In re Asean D.* (1993) 14 Cal.App.4th 467, 473.) "Nor does the court necessarily abuse its discretion by ordering the most restrictive placement before other options have been tried. [Citations.]" (*In re Eddie M.* (2003) 31 Cal.4th 480, 507.) Under this standard, the juvenile court's sentencing decision was well within its discretion.

The minor had a criminal record going back more than four years, during which many less restrictive alternatives had already been tried and had failed to rehabilitate the minor. Every time he was granted probation, he violated it repeatedly. His offenses grew steadily more serious, culminating in two adjudicated felonies, including a violent

offense with a firearm that constituted a section 707, subdivision (b), felony. According to Dr. Katz, the minor, who suffered from no major psychological disorder, denied all responsibility for his adjudicated crimes and showed no remorse or empathy. All of these facts showed, as the juvenile court found, a DJJ commitment was justified both to rehabilitate the minor and to protect society.

We reject the minor's assertion he should not have been committed to DJJ because his criminal history was not "remarkabl[y] serious or violent . . . prior to the instant case." Even if we accepted this characterization of the minor's history, which we do not, it would fail to show the juvenile court abused its discretion. A commitment to the most restrictive placement may be considered without previous resort to less restrictive placements. (*In re Eddie M., supra*, 31 Cal.4th at p. 507; *In re Angela M., supra,* 111 Cal.App.4th at p. 1396; *In re Asean D., supra*, 14 Cal.App.4th at p. 473.)

The minor's assertion there is no evidence in the record that he will receive any services at all at DJJ is equally unpersuasive. In support of this assertion, the minor cites selectively to the special master's report. Even assuming this report was properly in evidence, the report does not support the minor's assertion he will not receive treatment at DJJ. The report describes the current status of specific areas of care for juveniles at DJJ, including areas of significant successes as well as areas posing the greatest difficulties. As noted by the juvenile court in its findings, the special master's report stated in its conclusion that the agreed-upon IBTM is showing great promise. Further, the special master makes recommendations for improvement and will continue to monitor DJJ's programs for compliance. In any event, juvenile courts may not disregard the sentencing laws, nor their objectives of seeking to rehabilitate juvenile offenders while punishing their offenses and protecting the public, because there are shortcomings at DJJ.

Finally, the minor has not shown less restrictive, yet effective alternatives were available. At the contested disposition hearing, he failed to show any treatment program had accepted him or was prepared to accept him.

10

On this record, the juvenile court's order committing the minor to DJJ was a proper exercise of discretion.

## DISPOSITION

The order committing the minor to the Division of Juvenile Justice is affirmed.


      HOCH    , J.


We concur:


      HULL    , Acting P. J.


      ROBIE    , J.