Filed 12/5/14  In re E.G. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| In re E.G., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>E.G.,<br><br>        Defendant and Appellant. | A140935<br><br>(Contra Costa County Super. Ct. No. J1301182) |

Minor E.G. (Minor) appeals after the juvenile court committed him to the California Department of Corrections and Rehabilitation, Division of Juvenile Justice (also Division of Juvenile Facilities; hereafter DJJ)[1], with a maximum confinement period of five years, based on his plea of no contest to one count of robbery.  He contends the juvenile court abused its discretion in committing him to DJJ rather than to a less restrictive placement, that the juvenile court failed to consider his educational needs, and

---

[1] In 2005, the powers of the Department of the Youth Authority (or California Youth Authority, or CYA) were transferred to the Department of Corrections and Rehabilitation, Division of Juvenile Facilities (DJF).  (Gov. Code, § 12838.5; Welf. & Inst. Code, § 1710.)  DJF is part of DJJ.  (*In re D.J.* (2010) 185 Cal.App.4th 278, 280, fn. 1.)  The record below refers to the authority to which Minor was committed as DJJ, and we shall do likewise.

1

that the conditions of probation should be stricken. We shall order the probation conditions stricken and otherwise affirm the judgment.

## I. BACKGROUND

Late one evening in October 2013, a homeowner heard a commotion near his basement door.[2] He saw one person fleeing the area, another standing near the door, and Minor leaving the basement, armed with a gun. The homeowner tried to wrestle the gun away from Minor. He heard the gun "clicking," as if Minor were pulling the trigger, although the gun was not fired. The homeowner took the gun from Minor and held him down until police arrived.

The homeowner's 15-year-old son was present. His 20-year-old son told police the three suspects came to rob them of marijuana, and that they had taken one large freezer-type bag with marijuana in it. Minor told police he had heard the house had money and marijuana, that he saw it as an opportunity to make money, and that the three intruders had planned the "job." He said the gun had only four bullets, and that "he had the gun 'on an empty chamber.' " He pulled the trigger during the struggle with the homeowner because he heard the homeowner say he was going to kill Minor because Minor was trying to kill his son.

Police officers inspected a revolver found on the scene. The gun had two empty chambers, three live rounds, and one spent casing. Officers also found two bags of suspected marijuana.

The Contra Costa County District Attorney filed a juvenile wardship petition pursuant to Welfare and Institutions Code[3] section 602 against Minor, alleging he committed three counts of second degree robbery (Pen. Code, § 211 & 212.5, subd. (c)), and one count of first degree residential burglary (Pen. Code, § 459 & 460, subd. (a)). The petition included allegations that Minor personally used a firearm (Pen. Code, §§ 12022.53, subd. (b) & 12022.5, subd. (a)) and an allegation that the burglary was

[2] Because there was no contested jurisdictional hearing, the facts are taken from the probation department's report.

[3] All undesignated statutory references are to the Welfare and Institutions Code.

2

committed while a nonparticipant was present in the residence (Pen. Code, § 667.5, subd. (c)(21)). The alleged offenses took place nine days before Minor's 18th birthday.

Minor pled no contest to one felony robbery allegation, and the remaining allegations were dismissed. Following a contested disposition hearing, the court adjudged Minor a ward of the court and committed him to DJJ for five years.

## II.  DISCUSSION

### A.  Commitment to DJJ

Minor contends the juvenile court abused its discretion in committing him to DJJ because appropriate, less restrictive alternatives were available, and there was no evidence he would benefit from placement at DJJ.

"The appellate court reviews a commitment decision for abuse of discretion, indulging all reasonable inferences to support the juvenile court's decision. [Citations.] Nonetheless, there must be evidence in the record demonstrating both a probable benefit to the minor by a CYA commitment and the inappropriateness or ineffectiveness of less restrictive alternatives. [Citations.] A CYA commitment may be considered, however, without previous resort to less restrictive placements. [Citations.]" (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396; see also *In re Teofilio A.* (1989) 210 Cal.App.3d 571, 576–577.) In making its finding of probable benefit, "[t]here is no requirement that the court find exactly how a minor will benefit from being committed to DJJ. The court is only required to find if it is probable a minor will benefit from being committed." (*In re Jonathan T.* (2008) 166 Cal.App.4th 474, 486.

Section 202, subdivision (b), provides that minors who are under the jurisdiction of the juvenile court as a result of delinquent behavior "shall, in conformity with the interests of public safety and protection, receive care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances. This guidance may include punishment that is consistent with the rehabilitative objectives of this chapter." "Punishment" is defined as "the imposition of sanctions," which may include payment of a fine, community service, conditions of probation or parole, "[c]ommitment of the minor to a local detention or

3

treatment facility, such as a juvenile hall, camp, or ranch," and "[c]ommitment of the minor to the Division of Juvenile Facilities, Department of Corrections and Rehabilitation." (§ 202, subd. (e).)  In reaching a suitable disposition for a minor who has been found to be a person described by section 602, the juvenile court "shall consider, in addition to other relevant and material evidence, (1) the age of the minor, (2) the circumstances and gravity of the offense committed by the minor, and (3) the minor's previous delinquent history." (§ 725.5.)

The court in *In re Carl N.* (2008) 160 Cal.App.4th 423, 432–433, explained the purposes of the governing law as follows:  "The statutory declaration of the purposes of the juvenile court law is set forth in section 202.  [Citation.]  Before the 1984 amendment to section 202, California courts consistently held that ' "[j]uvenile commitment proceedings are designed for the purposes of rehabilitation and treatment, not punishment." ' [Citation.]  California courts treated a commitment to CYA as 'the placement of last resort' for juvenile offenders.  [Citation.]  [¶] However, '[i]n 1984, the Legislature replaced the provisions of section 202 with new language which emphasized different priorities for the juvenile justice system.' [Citation.]  Section 202, subdivision (b) . . . now recognizes punishment as a rehabilitative  tool.  [Citation.]  . . . [¶] 'Section 202 also shifted its emphasis from a primarily less restrictive alternative approach oriented towards the benefit of the minor to the express "protection and safety of the public" [citations], where care, treatment, and guidance shall conform to the interests of public safety and protection.  [Citation.]' [Citation.]  'Thus, it is clear that the Legislature intended to place greater emphasis on punishment for rehabilitative purposes and on a restrictive commitment as a means of protecting the public safety.' [Citation.]  It is also clear . . . that a commitment to CYA 'may be made in the first instance, without previous resort to less restrictive placements.' " (See also *In re Michael D*. (1987) 188 Cal.App.3d 1392, 1396.)

Bearing these standards in mind, we consider the evidence before the juvenile court.  The probation department's report included a summary of the offense, as well as notes of an interview with Minor.  Minor had said he participated in the offense because

4

he and the other minors involved wanted marijuana and money. He carried the gun during the offense, and wore a mask and gloves. He had checked the gun beforehand and knew it had four live rounds; when he pulled the trigger more than once during his struggle with the homeowner, he realized it was likely the next shot would be a live round. He said one of the other minors involved had made arrangements with one of the residents of the house to ensure he would be at home. Minor described his actions in part as the result of peer pressure.

The probation department's report also noted that Minor said he had once been hospitalized under section 5150 when he made suicidal statements after a physical fight with his mother, and that he had seriously thought of harming himself on three other occasions because he was depressed. He was on mental health observation at Juvenile Hall. Minor said that when he was younger, he had suffered physical abuse by his grandfather and by his mother.

Using the Juvenile Assessment and Intervention System to assess the risk that Minor would reoffend, the department classified him as being at high risk of reoffense, and determined he would benefit from a "Limit Setting . . . supervision strategy," with the goals of promoting legal means of achieving money, power, and excitement; working to change the minor's attitudes and values so that he would use his skills in a "pro-social manner," and protecting the public.

Minor had been screened for various possible local placements. A probation placement supervisor had screened him for out-of-home placement, and found him inappropriate for such a placement because of the nature of the offense and the risk to public safety. A probation manager had screened him for the Youth Offender Treatment Program (YOTP), and found him inappropriate for the program because of the nature of the offense and the fact that Minor had possessed and used a weapon. The facility director for the Orin Allen Youth Rehabilitation Facility (OAYRF) had screened Minor and found him unsuitable for OAYRF because of the seriousness of his offense and the use of a firearm.

5

Minor had also been screened by a representative of DJJ, who had found him to be appropriate for DJJ because of the nature of his offense. According to the probation department's report, "Upon arrival at DJJ, the minor would be assessed for educational and mental health needs. He would then be enrolled in programs to address anger management, theft awareness, substance abuse, and victim awareness, among other possible counseling programs."

The report concluded, "The most appropriate course of action would be to commit [Minor] to DJJ. Local alternatives have been considered, but are deemed inappropriate due to the gravity of the offense, the need to protect the public, and the minor's high risk to reoffend without a significant rehabilitation period in a secure setting. [¶] While at DJJ, [Minor] will be assessed for his individual needs. Regular programming will address violence, mental health, and substance abuse. This structured environment will remove the risk from the community for a period of time, and provide a structure where [Minor] will be held accountable and faced with rehabilitation that will focus on redirection towards socially acceptable behavior."

In his opposition to the probation department's recommendation, Minor pointed out that this was the first occasion he had been before the juvenile court, and asked to be screened for "Bar-O," a placement near the Oregon border, or that he be ordered to go to YOTP. While acknowledging the seriousness of his offense, Minor argued that either Bar-O or YOTP would allow him to "improve himself, receive mental health treatment and be removed from the community for a significant amount of time."

At the contested dispositional hearing, the probation officer who had interviewed Minor testified that Minor's behavior in juvenile hall had been good. She testified the department had considered the local alternatives before recommending that Minor be committed to DJJ. The department's recommendation was guided in part by Minor's age and by the gravity of his offense. She recalled one instance in which a minor who had discharged a gun had been admitted to YOTP; the minor there had shot himself in the leg.

In reaching its decision to commit Minor to DJJ, the juvenile court noted the gravity of the offense, pointing out that "this case could have just as easily been a

6

homicide case as it was a robbery case." The court also noted that the offense was a "sophisticated planned-out robbery where [he] set up a drug deal," that Minor had acted with others, that the offense took place only nine days before his 18th birthday, that he was beyond his parents' control, and that he had been a chronic substance abuser for a number of years. The court also concluded Minor was in "great need" of the services he would receive at DJJ. The court noted expressly that it had not only admitted into evidence the probation report, but had considered Minor's age, the circumstances and gravity of the offense, and Minor's lack of a prior delinquent history.

This record supports the juvenile court's conclusion that DJJ was the appropriate placement for Minor. There was evidence that the probation department screened Minor for the available local placements, that out-of-home placement would not be appropriate, and that the two local programs, YOTP nor OAYRF, would not accept him because he had used a gun during his offense and had pulled the trigger during the struggle with the homeowner.[4] (See § 202, subd. (e)(4) [sanctions may include commitment of minor to local detention or treatment facility].) There was also evidence that at DJJ he would have access to counseling programs, including programs to address anger management, theft awareness, substance abuse, and victim awareness. Finally, the court properly considered Minor's age and the gravity of his offense as factors militating in favor of a CJF commitment. The evidence is sufficient to demonstrate both a probable benefit to Minor from the commitment and the inappropriateness of less restrictive alternatives. (See *In re Angela M.*, *supra*, 111 Cal.App.4th at p. 1396.) The juvenile court did not abuse its discretion.

**B. Minor's Educational Needs**

Minor next contends the juvenile court failed to consider his educational needs before committing him to DJJ, and asks us to remand the matter to the juvenile court to allow it to do so. For this assertion, he relies on *In re Angela M.*, *supra*, 111 Cal.App.4th 1392. The juvenile court there was on notice that the minor might have special

---

[4] Minor has not drawn our attention to any evidence about the Bar-O program.

7

educational needs:  a court-appointed psychologist had concluded she was suffering from bipolar disorder and might be experiencing symptoms associated with ADHD, and had recommended that she be evaluated by education professionals to determine whether she had special educational needs.  (*Id*. at pp. 1395, 1398–1399.)  However, although the record indicated special attention should be paid to the minor's educational needs, the juvenile court did not mention the issue when committing her to the CYA.  (*Id*. at p. 1399.)  The Court of Appeal remanded the matter to permit the juvenile court to make proper findings regarding the minor's educational needs.  (*Ibid*.)

In reaching this conclusion, the court in *In re Angela M*. noted:  "Education Code section 56000 declares that 'all individuals with exceptional needs have a right to participate in free appropriate public education . . . .'  'Individuals with exceptional needs' includes any child who is '[i]dentified by an individualized education program [IEP] team as a child with a disability,' as defined by the Individuals with Disabilities Education Act (20 U.S.C. § 1400 et seq.), whose impairment 'requires instruction, services, or both which cannot be provided with modification of the regular school program' and who meets certain other prescribed eligibility criteria.  (Ed. Code, § 56026, subds. (a), (b), (c) & (d).)  A child qualifies as an individual with exceptional needs if the IEP team determines 'the degree of the pupil's impairment . . . requires special education in one or more of the program options authorized by Section 56361 of the Education Code.'  (Cal. Code Regs., tit. 5, § 3030.)"  (*In re Angela M.*, *supra*, 111 Cal.App.4th at pp. 1397–1398, fns. omitted.)  The court also noted that the then-operative California Rules of Court,[5] rule 1493(e)(5) required the juvenile court, when declaring a child a ward of the court, to " 'consider the educational needs of the child . . . .' "  (*Id*. at p. 1398.)  Although this rule has since been repealed, the version of rule 5.651(b)(2) in effect at the time the juvenile court made the order at issue in this appeal required the

---

[5] All rule references are to the California Rules of Court.

court, at a disposition hearing in a delinquency case, to "address and determine the child's general and special education needs . . . ."[6]

This case is readily distinguishable from *In re Angela M.* Here, the probation department prepared a report that informed the court that Minor had attended high school through 11th grade, that he dropped out during his senior year, that he had completed 114 credits toward graduation, and that he was not a special education student. This record, unlike that in *In re Angela M.*, did not put the court on notice that Minor had special educational needs.[7] In the circumstances, the juvenile court could properly commit Minor to DJJ without investigating further his educational needs.

## C. Probation Conditions

At the dispositional hearing, the juvenile court imposed conditions of probation. Minor contends the conditions are invalid and should be stricken. We agree. "[T]he juvenile court loses the authority to impose conditions of probation once it commits a ward to DJF." (*In re Edward C.* (2014) 223 Cal.App.4th 813, 829; see also *In re Travis J.* (2013) 222 Cal.App.4th 187, 202; *In re Ronny P.* (2004) 117 Cal.App.4th 1204, 1208; *In re Allen N.* (2000) 84 Cal.App.4th 513, 515–516.) The Attorney General concedes this point, while suggesting that conditions of probation might have been proper if they had been intended to apply only to the time Minor spent in juvenile hall before being transported to DJJ. There is no indication that the juvenile court intended the conditions' reach to be so limited. We shall accordingly strike the probation conditions.

---

[6] In addition, rule 5.805(5) provides in part that, if the court commits a youth to DJJ, it "must provide to the DJJ information regarding the youth's educational needs, including the youth's current individualized education program if one exists."

[7] We are not persuaded otherwise by the statement in the probation department's report that Minor had "educational, behavioral, and substance abuse needs." By virtue of the fact that he had not graduated from high school, Minor had educational needs. That does not indicate that he required special education.

### III.    DISPOSITION

The conditions of probation imposed in its December 19, 2013 dispositional order committing Minor to DJJ are stricken.  As so modified, the judgment is affirmed.


_____

Rivera, J.


We concur:


_____

Ruvolo, P.J.


_____

Reardon, J.