Filed 5/7/21  In re I.B. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re I.B., a Person Coming Under the Juvenile Court Law. | C089300 |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>I.B.,<br><br>        Defendant and Appellant. | (Super. Ct. No. JV138181) |

Minor I.B. was the subject of a sustained wardship petition under Welfare and Institutions Code[1] section 602 after he admitted two counts of assault with intent to commit rape.  The court initially placed him in a Level B placement.  Upon his release,

---

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

I.B. violated the terms of his probation on multiple occasions. After admitting the probation violations and following a contested dispositional hearing, the juvenile court committed him to the Division of Juvenile Justice (DJJ) over his counsel's objection that another Level B placement was appropriate.[2]

I.B. contends on appeal that the juvenile court abused its discretion in committing him to the DJJ because a less restrictive alternative—another chance at a Level B placement—was arguably more appropriate under the circumstances. He also challenges the custody credits listed in the minute order, which he claims does not reflect the court's oral pronouncement of credits.

After examining the record, we find no abuse of discretion because substantial evidence supports the juvenile court's DJJ placement decision. We shall order the minute order corrected to reflect the appropriate credit amount.

BACKGROUND

In December 2015, 14-year-old I.B. accosted Maria Doe while she was walking home. I.B. grabbed her arms, pushed her down on the ground, and pulled her pants down. As Maria struggled to get away, I.B. pulled his pants down. After she started screaming her husband's name, I.B. released her and fled.

Eight months later in August 2016, when I.B. was 15 years old, he approached Cheryl A. from behind while she was on a morning walk. I.B. grabbed her buttocks with his hand. When she turned around, I.B.'s pants were down and he was rubbing his exposed penis. Cheryl tried to leave, but I.B. grabbed her and dragged her to some nearby bushes. While she screamed and struggled, I.B. pulled her pants down. Cheryl screamed "fire," and I.B. released her and fled.

---

[2]     A Level B placement is a placement at an out-of-state residential treatment facility.

The Sacramento County District Attorney filed a section 602 petition on August 15, 2016, alleging that I.B. committed several sexual offenses against Cheryl, including assault with the intent to commit rape (Pen. Code, § 220—count 1), false imprisonment by violence (Pen. Code, § 236—count 2), kidnapping (Pen. Code, § 207, subd. (a)—count 3), sexual battery (Pen. Code, § 243.4, subd. (e)(1)—count 4), and indecent exposure (Pen. Code, § 314, subd. (1)—count 5).[3] The juvenile court ordered him detained.

In October 2016, the district attorney filed an amended section 602 petition adding three additional counts against I.B.: assault with intent to commit rape of Maria Doe (Pen. Code, § 220—count 7), indecent exposure (Pen. Code, § 314, subd. (1)—count 8), and loitering on the property of Thao H. (Pen. Code, § 647, subd. (h)—count 9). I.B.'s maximum term of confinement was seven years four months.

In April 2017, I.B. admitted both counts of assault with intent to commit rape (counts 1 & 7) in exchange for a Level B placement and dismissal of the remaining counts subject to consideration at the dispositional hearing. The juvenile court sustained the amended petition, ordered defendant to undergo a psychological evaluation to assist in determining an appropriate disposition, and ordered probation to evaluate Level B placement options.

The court appointed Dr. Blake Carmichael, a psychologist at U.C. Davis Children's Hospital, to evaluate I.B. to determine his diagnosis and treatment needs, the type of sexual offender treatment program that would benefit him, whether and what level of risk I.B. posed to himself or others, and whether he needed intensive hospital-based treatment or whether community-based treatment was more appropriate.

---

[3]     The section 602 petition also included an additional count of sexual battery against Valerie W.  (Pen. Code, § 243.4, subd. (e)(1)—count 6.)

Dr. Carmichael interviewed I.B. and examined his background and family history; he also assessed I.B.'s behavior, mental health symptoms, and sexual offense history.

I.B. was initially removed from his biological mother's care for physical abuse and neglect when he was two years old; he was later returned to her and then removed again and adopted at age four. Although he did not remember it, I.B. may have observed inappropriate sexual activity or been sexually abused before being removed from his mother's care.

I.B. generally had a good relationship with his adoptive mother, although she was pretty strict. I.B. had behavioral problems from an early age that later developed into open defiance and aggressiveness during adolescence. His adoptive mother had twice called police when his defiance escalated to an uncontrollable level. His conduct was better when he took prescribed lithium, although I.B. admitted he did not always take the medication.

According to I.B., he had committed sexual offenses on three occasions: he first exposed himself to a school staff person while trying to get expelled, and later accosted the two women, who were strangers to him, that were the subject of the allegations in the amended section 602 petition. He denied that he intended to rape the women, however. I.B. recognized that he needed help.

Dr. Carmichael diagnosed I.B. with mood dysregulation disorder and other specified disruptive, impulse control and conduct disorder. Given his history of rule-breaking behavior and violating the rights of others, I.B. was at a higher risk for progressing toward conduct disorder should recommended services not be implemented. Dr. Carmichael recommended I.B. participate in mental health treatment services and a formal adolescent sexual offender treatment program. In his opinion I.B. posed a moderate to high risk of sexual offense recidivism.

At the dispositional hearing in June 2017, the court adjudged I.B. a ward of the court (§ 725, subd. (b)) and committed him to a Level B placement at Woodward

4

Academy, an out-of-state residential treatment facility. The court calculated his maximum term of confinement as seven years four months, and awarded him 299 days of predisposition credit. The next month, I.B. was awarded an additional 50 days of juvenile hall custody credits.

On August 1, 2018, I.B. completed his Level B placement program, where he enrolled in a sex offender treatment program, and was allowed to return home under electronic surveillance. He was continued as a ward of the court, and placed with his adoptive mother.

The probation officer reported to the court in October 2018 that I.B. was not adjusting well to field supervision and had many issues, including being suspended from his school for refusing to attend his scheduled classes and also refusing to attend Capital Academy, the new school where his mother had enrolled him. He refused in-home therapeutic services and became confrontational with his mother. I.B. threatened to move in with his biological grandmother, with whom he had recently reconnected, and also said he would obtain a firearm to commit robberies to support himself financially.

Although I.B.'s attitude and behavior improved somewhat, by November 2018, I.B. used a rock to hit and scratch his mother's vehicle. He also stabbed the kitchen cabinets with a butcher knife. Fearing I.B., his mother attempted to leave the home and get into her car. I.B. got onto the roof of the car, causing multiple dents, and began hitting the car windows, yelling at her not to leave. She did not drive away because she was scared she would injure him.

Not only did I.B. violently "blow up" at his mother, he also refused to follow her directives, refused to attend school, and absconded from treatment without permission. As a result, in November 2018, he was sanctioned with a "Waiver in Lieu for 4 days of Juvenile Work Project." He received counseling for his behavior and was told to follow his mother's directions and house rules.

5

That same month, a therapist at Woodward Academy reported to the police that she received two videos containing a black male masturbating via Facebook messenger from I.B.'s Facebook profile.

At the end of November 2018, I.B. was involved in a physical altercation at Capital Academy and was suspended for a day. That evening, he had another "blow up" with his mother, and tried to set fire to the home by openly burning items over the stove. His mother called the police. I.B. was taken into custody on a section 5150 hold, but was released the following day after a psychiatric evaluation determined the incident was behavioral rather than mental health related. I.B.'s probation officer directed him to change his behavior, obey his mother, and stop being destructive at home.

At the beginning of December 2018, I.B. attended a school re-entry meeting. He walked out of the meeting and refused to attend school.

Two days later, on December 5, 2018, I.B.'s mother informed his probation officer about a verbal dispute with I.B. in which he disobeyed her directives. Because he was highly agitated and verbally aggressive, I.B.'s mother feared for her safety and called law enforcement. Responding officers counseled I.B., but did not take him into custody. After they left, I.B.'s negative treatment toward his mother escalated. I.B. kicked her bedroom door in, breaking it in half. He then prevented her from leaving the room. After managing to escape, she tried to leave in her car, which was parked in the garage. I.B. tried to close the garage door on her car twice, and she spent the rest of the night in her car.

On December 7, 2018, the probation officer filed a notice under section 777 alleging that I.B. had violated the conditions of his probation by failing to obey the reasonable directives of the probation officer and his legal guardian and by refusing to attend school. That same day, the court ordered I.B. detained.

On December 19, 2018, a second notice of violation under section 777 was filed. The notice of violation alleged that I.B. criminally threatened his legal guardian (Pen.

6

Code, § 422—count 1), repeatedly vandalized her property (Pen. Code, § 594, subd. (b)(1)—counts 2, 3, & 6), and falsely imprisoned her by violence (Pen. Code, § 236—counts 4 & 5).

In January 2019, the juvenile court directed the probation officer to refer I.B. to the Interagency Placement Committee (IPC) for an evaluation of the best level of placement.[4] IPC recommended that I.B. be committed to the DJJ. According to IPC, there was no suitable alternative for I.B. because he committed a sexual offense even after completing a sexual offender program at a Level B facility, and he adjusted poorly to home supervision and community-based services. His escalating aggressive and violent behavior resulted in multiple threats to his mother and significant property damage to her home.

The IPC report outlined several activities and benefits available to I.B. if committed to DJJ. His needs regarding education, employment, family, community support and stability, and peer influences would be assessed, and his violence, aggression, and substance abuse issues would be addressed. Beneficial programs available to I.B. included: a training focused on improving social skills, competence, moral reasoning, and anger control, a program to reduce recidivism through enhanced pro-social skills, trauma-focused behavioral therapy, a program focused on avoiding aggression and violence through use of alternative thinking and behavior methods, a curriculum designed to prevent substance abuse, a program to develop cognitive-behavioral social skills, a mental health treatment program, academic programs, and vocational programs with the opportunity for job placement. The DJJ would also

---

[4] During this time, probation also referred I.B. to all Level B facilities. He was denied at three facilities, including Woodward Academy where he had completed the sexual offender treatment program, and was accepted at one facility.

encourage family members and other appropriate adult influences to participate in I.B.'s rehabilitation.

At the contested disposition hearing on April 5, 2019, I.B. admitted all of the alleged probation violations. The prosecutor requested a DJJ placement while defense counsel argued that insufficient evidence showed DJJ's programs would benefit I.B. Both parties submitted written briefs on the propriety of a DJJ commitment.

Dr. Soulier, a child forensic psychiatrist who evaluated I.B., testified for the defense. After examining I.B., Dr. Soulier concluded that he suffered from complex trauma disorder. He opined that I.B. had been severely traumatized when he was young, which resulted in emotional difficulty, impulsiveness, erratic and aggressive behavior, and made it difficult for I.B. to engage in or form meaningful relationships.

During his original Level B placement, I.B. had been taking lithium, which is a mood stabilizer. In September 2018, I.B. stopped taking the medication. Without lithium, Dr. Soulier believed I.B. would be prone to aggressiveness, hostility, and acting out impulsively. He recommended that I.B. resume taking the medication to stabilize his moods, that he be returned to a Level B group home for residential treatment, and that he have no further contact with his biological maternal grandmother or sisters, who encouraged him to use marijuana and engage in other negative behaviors.

Given the choice between I.B. going home versus going to DJJ, Dr. Soulier conceded he would choose DJJ. And when questioned about the masturbation video I.B. had sent to his former therapist at Woodward Academy, Dr. Soulier acknowledged that the incident constituted sexually inappropriate behavior that indicated I.B. had not accomplished the goals of the sexual offender treatment program and that he was still at risk of acting out in an inappropriate, or perhaps even criminal, sexual manner. In response to the court's question about I.B.'s risk of reoffending, Dr. Soulier responded that the risk was high enough to warrant return to a residential treatment environment rather than outpatient sexual offender treatment, which he deemed inappropriate.

8

During the hearing I.B.'s mother also addressed the court, recounting her continual disputes with I.B. over spending time with his biological family members, and his efforts to damage her property and set the house on fire. According to her, anything could set off I.B.'s explosive temper. Given his constant outbursts, his counselors instructed her to call the police each time there was a conflict.

After considering the evidence and arguments presented on the placement issue, the court found that it was in I.B.'s best interest to commit him to the DJJ. According to the court, the social benefit I.B. would receive from a Level B placement did not outweigh the risk to public safety that would result if he were not in a DJJ program.

In so ruling, the court recognized that it had to evaluate I.B.'s entire history in juvenile delinquency and had to consider the placement most beneficial for him and for the protection of society. The court noted I.B. was unable to regulate his explosive moods, which negatively affected those around him, and found that the prior Level B placement had not adequately addressed his anger and mood swing issues. The DJJ placement, in the court's view, would provide trauma therapy and programs that would address the deep-rooted trauma I.B. had suffered as a child and help him to better regulate his emotions.

The court committed I.B. to the DJJ for the maximum confinement term of seven years four months, not to exceed the statutory limitation for such commitment to age 25. (§ 731, subd. (c).) The court orally awarded I.B. 470 days of predisposition custody credits. I.B. timely appealed.

## DISCUSSION

### I

#### *DJJ Commitment*

I.B. contends the juvenile court abused its discretion in committing him to DJJ rather than to another Level B placement. In his view, insufficient evidence shows that a

9

DJJ commitment would benefit him or that a less restrictive alternative was not appropriate. We disagree.

Juvenile delinquency statutes are "designed to give the court 'maximum flexibility to craft suitable orders aimed at rehabilitating the particular ward before it.' " (*In re Greg F.* (2012) 55 Cal.4th 393, 411; *In re George M.* (1993) 14 Cal.App.4th 376, 379.) Thus, a juvenile court has broad discretion in determining the appropriate rehabilitative and punitive measures for juvenile offenders. (§ 202 [juvenile court must commit delinquent minors "in conformity with the interests of public safety and protection, [to] receive care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances"].)

The statutory scheme "contemplates a progressively more restrictive and punitive series of dispositions starting with home placement under supervision, and progressing to foster home placement, placement in a local treatment facility, and finally placement at the DJJ." (*In re M.S.* (2009) 174 Cal.App.4th 1241, 1250.) "Although the DJJ is normally a placement of last resort, there is no absolute rule that a DJJ commitment cannot be ordered unless less restrictive placements have been attempted." (*Ibid.*)

We review a commitment decision for abuse of discretion, indulging all reasonable inferences to support the juvenile court's judgment. (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396 (*Angela M.*).) "We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53; *In re Nicole H.* (2016) 244 Cal.App.4th 1150, 1154 [substantial evidence must support juvenile court's factual findings in support of placement decision].)

A juvenile court does not abuse its discretion by committing a minor to the DJJ where the evidence demonstrates a probable benefit to the minor from the commitment and less restrictive alternatives would be ineffective or inappropriate. (*Angela M., supra,*

111 Cal.App.4th at p. 1396; § 734 [prohibiting DJJ commitment "unless the judge of the court is fully satisfied that the mental and physical condition and qualifications of the ward are such as to render it probable that he will be benefited by the reformatory educational discipline or other treatment provided" by the DJJ].)  When evaluating a juvenile court's exercise of discretion to commit a minor to the DJJ, we are mindful of not only rehabilitation and punishment, but also public safety and protection.  (*In re Luisa Z.* (2000) 78 Cal.App.4th 978, 987; see also *In re Jonathan T.* (2008) 166 Cal.App.4th 474, 486 ["it is not merely the programs at DJJ which provide a benefit to minor, but the secure setting as well"].)

The juvenile court in this case did not abuse its discretion in determining that committing I.B. to DJJ was appropriate because the DJJ had the programs and structured setting necessary to help I.B. rehabilitate and recover from the childhood trauma he suffered, which the court found was at the root of his emotional, sexual, and criminal problems.  Based on the evidence presented, the court reasonably concluded that referring I.B. to a second Level B placement would be ineffective to meet his needs and to protect the public.

Although I.B. had made some progress toward rehabilitation at his initial Level B placement, he quickly relapsed into destructive behaviors upon returning home.  Only a short time after completing the juvenile sexual offender treatment program at Woodward, I.B. sent a female therapist two masturbation videos from his social media account.

From this evidence, the court could reasonably infer that I.B. continued to engage in sexually inappropriate behavior even though he had already completed his Level B placement program.  The evidence also showed that I.B. repeatedly disobeyed his mother and became increasingly violent by threatening her and destroying her property.  He threatened to obtain a firearm and commit robberies, tried to burn down his mother's house by openly burning items on her stove, and repeatedly stabbed her kitchen cabinets with a knife.

Based on these circumstances, the IPC found that another Level B placement would be ineffective, and that committing I.B. to the DJJ was preferable because it had the types of programs and structured environment needed to fully address not only I.B.'s inappropriate sexual impulses, but also his underlying trauma and aggressiveness. According to the IPC report: "The [IPC] does not believe there are suitable alternatives to a commitment to DJJ at this time. The minor has had the benefit of out-of-state placement services in a sexual offender program, yet has continued to commit a sexual offense after his graduation. Additionally, the minor has made a poor adjustment to home supervision and community-based services in that his aggressive and violent behavior has escalated over the past few months to the point that he has caused serious property damage to his and his mother's home and physically threatening his mother on numerous occasions." The IPC report also highlighted several activities and benefits available to I.B. if committed to DJJ. His needs regarding education, employment, family, community support and stability, and peer influences would be assessed, and programs were available to address his violence, aggression, and substance abuse issues would be considered.

While Dr. Soulier recommended a second attempt at a Level B placement, he conceded that the sexually inappropriate video I.B. sent a Woodward therapist showed the Woodward program had not successfully rehabilitated I.B. Dr. Soulier also characterized I.B.'s risk of reoffending as sufficiently high to warrant a residential treatment environment rather than outpatient sexual offender treatment. And while he said that some of I.B.'s issues stemmed from him not taking lithium, the record shows that I.B. himself repeatedly chose not to take the medication because he did not believe he was going to sexually reoffend or simply because he did not want to take it.

After considering all the evidence, the juvenile court was well aware of DJJ's programs and I.B.'s need for a structured treatment environment that addressed not only his sexual offender issues, but also his underlying trauma and violent tendencies. Based

12

on the IPC's recommendation and the evidence that showed escalating problems at home and repeated probation violations that endangered others, including his mother, the court could reasonably conclude that DJJ was a more appropriate placement for I.B., both in terms of his own therapy and the protection of the public. (*Angela M., supra*, 111 Cal.App.4th at p. 1397 [juvenile court did not abuse its discretion in committing a minor to the California Youth Authority where evidence showed she had failed on probation at the local level in open placements, had continued to reoffend, and the CYA had intensive programs to address drug addiction, gang involvement, and mental health issues].) Thus, the juvenile court did not abuse its discretion by committing I.B. to the DJJ even though one Level B placement agreed to accept him.

## II

### *Custody Credits*

The parties agree that the final disposition hearing minute order does not accurately reflect the amount of predisposition custody credits the court orally awarded defendant.

Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185-186.) "If the judgment entered in the minutes fails to reflect the judgment pronounced by the court, the error is clerical, and the record can be corrected at any time to make it reflect the true facts." (*People v. Hartsell* (1973) 34 Cal.App.3d 8, 13.)

Here, the juvenile court orally awarded I.B. credit for 470 days of predisposition custody credits at the final disposition hearing. (*In re Emilio C.* (2004) 116 Cal.App.4th 1058, 1067 ["[A] minor is entitled to credit against his or her maximum term of confinement for the time spent in custody before the disposition hearing"].) The minute order for the hearing, however, reflects that I.B. is entitled to only 121 days of credit.

Accordingly, we shall order the minute order corrected to conform to the court's oral pronouncement during the disposition hearing.

DISPOSITION

The clerk is directed to prepare a corrected minute order that reflects the juvenile court's oral award of 470 days of predisposition custody credit.  In all other respects, the judgment is affirmed.

_____/s/_____
BLEASE, Acting P. J.

We concur:

_____/s/_____
DUARTE, J.

_____/s/_____
HOCH, J.