Filed 10/18/21  In re W.L. CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re W.L., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>W.L.,<br><br>Defendant and Appellant. | A160886<br><br>(Del Norte County<br>Super. Ct. No. CRF159237) |

W.L. appeals from a disposition order committing him to the Department of Corrections and Rehabilitation, Division of Juvenile Justice (DJJ).  His contention that the juvenile court failed to properly consider less restrictive commitments is unsupported by the record, so we affirm.

## BACKGROUND

**The Crime and Conviction**

M.B. was walking home from a party late at night when three males forced her into a house, tried to force her to drink

1

alcohol, and raped her repeatedly over the course of some three to four hours.[1]  W.L., who was 16 years old, was one of them.

W.L. was tried as an adult and found guilty of rape in concert, with the circumstance that the victim was kidnaped in the commission of the offense.  This court conditionally reversed the judgment pursuant to an intervening change in the law and remanded the case to the juvenile court for a hearing to determine whether it should proceed in juvenile or adult court. In light of the nature of the crime and W.L.'s lack of insight, the juvenile court ordered that he remain in custody pending the transfer hearing for his own protection and that of the public.

**The Transfer Hearing**

The prosecution moved to transfer the case to adult court. The Del Norte County probation department (department) recommended that W.L., then 21, be transferred to adult court. Although the department believed there was sufficient time for W.L. to be rehabilitated before the juvenile court's jurisdiction terminated when he turned 25, it was uncertain whether rehabilitation was possible.  The report explained:  "The seriousness and gravity of the offense and the severity of the trauma imposed on the victim suggest that this matter was appropriately addressed in criminal court and should remain in criminal court.  By the non-minor's actions in the offense, kidnapping in concert, attempting to intoxicate the victim in

---

[1] The incident is described in greater detail in our opinion in W.L.'s previous appeal, *People v. W.L.* (Dec. 11, 2018, A149231)[nonpub. opn.].

2

concert, refusing to allow the victim to use the restroom or leave his home, raping the victim over and over, and then telling her not to report the incident to police, he appears to show a higher degree of criminal sophistication. Someone with this level of sophistication knew what he was doing was wrong from the beginning and chose to continue to act in such a manner."

In opposition to transfer, W.L. submitted the expert report of psychiatrist Dr. Anne McBride, an assistant clinical professor with the UC Davis Medical Center Department of Psychiatry and Behavioral Sciences. Dr. McBride opined that W.L. could be rehabilitated in the juvenile justice system because very few risk factors contributed to his offense. "The most notable risk factor included his youthfulness and developmental immaturity. He was raised in a stable environment, absent of maltreatment and violence, with strong family support. His risk-taking behavior was limited to adolescence. He has not continued to engage in negative behaviors, has been entirely compliant in custody, responsive to treatment, and free of violence or discipline. The features of youth which contributed to his offense are ones he has already demonstrated growth and maturity during his incarceration, reflective of his continued capacity for growth and maturation."

"The remaining risk factors applicable to [W.L.] include his response to the offense such as his lack of accepting responsibility which contributes to problems in remorse and empathy related to the offense. [W.L.] has maintained his innocence throughout his case and has otherwise demonstrated a pattern of behavior and

3

relationships that indicates a clear capacity for age-appropriate empathy and remorse. Regardless, these risk factors are typically the focus of juvenile sexual offender treatment. Given his low risk for future general and sexual violence, in my medical opinion, [W.L.] can be managed in the community rather than in a custodial setting. Treatment is readily available in the community and appropriate to address ongoing risk factors effectively." Nonetheless, Dr. McBride did not identify what, if any, resources were available in the community to treat and to rehabilitate him.

In the interview with Dr. McBride, W.L. said, "I'm innocent" and that [M.G.] had consensual sexual intercourse with each of the three males, none of whom "would force themselves upon anybody." In response to a question about the victim's reaction to sexual intercourse with him, W.L. said, "She was enjoying it. I could tell she was. She was expressing her pleasures. . . . She never once told me to stop." W.L.'s mother, interviewed by Dr. McBride, blamed the victim for the offense and confirmed that W.L. believed he was innocent.

At the transfer hearing, the prosecution argued that W.L. could not be rehabilitated in juvenile court and should therefore be treated as an adult offender: "[H]e is 21 now. And the Court has the jurisdiction until he is 25. And I think there is [*sic*] limited programs and I don't think he can be rehabilitated."

The juvenile court found the prosecution had not met its burden of proof, denied the transfer motion, and set the matter for a disposition hearing.

4

**The Disposition Hearing**

The department's disposition report recommended commitment to the DJJ. It advised: "[W.L.] scores low-moderate for risk to reoffend. Juvenile probation is focused on rehabilitation and addressing the needs of the individual. While the non-minor has been incarcerated for nearly four (4) years, the crime he is now adjudicated on is heinous and requires completion of an appropriate sexual offender treatment program before being able to be returned to the community and considered to have met the rehabilitative goal of probation.

"Due to the non-minor's age, he is not eligible for a short term residential treatment program . . . focused on sexual offender treatment. The Probation Department believes the non-minor would best receive rehabilitative services related to the crime at the [DJJ]. This recommendation was not taken lightly after reviewing a copy of Dr. Anne McBride['s] case file review of the non-minor and her conclusions. However, DJJ is the most adequate place to provide rehabilitative services to the non-minor. DJJ will continue to provide structure and support while offering programs specific to the non-minor's sexual offending behavior.

"While at DJJ, the non-minor will receive a comprehensive assessment which will result in the development of the non-minor's initial individualized treatment plan. This assessment will focus on outlining individual dynamic risks as well as treatment objectives for progress in the program and the

5

objectives that should be accomplished for successful completion of their sex behavior treatment program.

"While in this residential treatment program at DJJ, the non-minor will engage in group therapy, individual therapy, psycho educational resource groups, complete journals/ homework, experiential stage group therapeutic exercises, and biblio-therapy. The non-minor has reported numerous times of having to be selective in programs he chooses to participate in while incarcerated due to having to disclose the nature of the offense which led him to prison and the fear of his safety after he previously was targeted and assaulted within a few days of arriving at San Quentin. DJJ will provide these services to the non-minor in a safe environment where he will be around other offenders with similar committed offenses."

The prosecutor filed a brief urging that W.L. be committed to DJJ until age 25 for rehabilitation, for the public's protection, and to redress the victim's injuries. Like the department, the prosecutor believed W.L. was in need of the DJJ's intensive sex offender treatment program, a "therapeutic community living unit totally devoted to the comprehensive treatment of the resident," which typically takes at least two years to complete. The prosecutor emphasized the nature and gravity of W.L.'s crime, his continued denial of culpability in the face of incontrovertible evidence, his lack of remorse and empathy, and his blaming his actions on the victim for purportedly being intoxicated, instigating the sexual encounter, and "lying at trial."

6

"Without such [a] program," the prosecutor cautioned, "[W.L.] is doomed to repeat the same behaviors and put the public at risk."

Addressing the availability of other disposition options beyond the DJJ program, the prosecutor wrote, "there are no known group home[s] or outside programming that the People are aware of that would adequately treat him and protect society. [W.L.] would be a danger to the community if he were released as he failed to understand his actions were wrong. He can't take responsibility for his crime despite being convicted and spending time in prison and it is clear he will not take responsibilit[y] for his action if he is released. There are no sex offender group homes available for individuals over the age of 18. [W.L.] needs more than just [an] hour therapy session once a week. As the court is aware per a recent local case, our jail refuses to confine a person, and release a person with a pass to see [a] therapist. As the court is also aware, there were no sex therapists that were willing or able to successfully come to Del Norte Jail to provide therapy. Due to the defendant's repeated denials, lack of empathy, callousness, extreme indifference, and victim blaming it is evident he is in need of intense treatment, the kind that DJJ can provide."

At the outset of the scheduled disposition hearing on July 16, 2020, the defense successfully requested a continuance because "given the current pandemic situation, the defense has had a very difficult time preparing in the sense of securing the proper treatment admissions for [W.L.] that we are requesting to present to the court."

W.L. submitted a memorandum advocating for release to probation on time served and placement in a home-like, community-based setting.  He argued that this was in line with current law and science and served his best interests "because it brings with it important treatment and services that help promote rehabilitation and, consequently, public safety.  By ordering probation, the court will be able to leverage resources for [W.L.].  As an example, the Juvenile Probation Department may assist [W.L.] during the time remaining in planning for his future.  This may include college planning."  W.L. added that the juvenile court had "several tools" to ensure that a disposition of wardship and time served would ensure that he would be "in the most appropriate setting with the services and supports needed to help him succeed."  However, W.L. did not identify any specific "tools," placements or programs.

The continued disposition hearing took place on August 26, 2020.  The prosecutor reiterated her  view that a DJJ commitment presented the best possibility for rehabilitation.  W.L. continued to blame the victim and deny responsibility for his actions even after engaging in individual counseling, AA meetings, and other programming.  His lack of insight, remorse, and empathy required the "deep programming and counseling" DJJ offered.  On the other hand, the prosecutor warned, releasing W.L. to the custody of the family that believed he was innocent and supported his minimization of his crime "would reinforce his belief and lack of accountability that he did anything wrong."  Observing that W.L.'s family and counsel had been

8

unsuccessfully searching for community-based sex offender programs for some eight months, the prosecutor reiterated that such "programs don't exist." "Just to send him out in the community with the hope willy-nilly that his family is going to keep him [on] the straight and narrow, is not addressing the problems this minor has in rehabilitating so it doesn't happen again."

DJJ, in contrast, offered an intensive sex-offender treatment program that W.L. could start immediately. And while W.L. had avoided participating in sex offender programs in prison for fear of reprisals from other prisoners, the probation officer explained that the DJJ program took place in a safe environment, with other offenders who had committed similar offenses.

Defense counsel continued to urge rehabilitation in the community in light of the length of W.L.'s incarceration; his participation in classes, AA meetings and religious activities; his good record while incarcerated; and his supportive family and community. Counsel acknowledged that W.L. "maintains his innocence" and that there were no available private treatment programs, but asserted generally and without elaboration that the department "has the means of providing those services."

W.L.'s parents also spoke at the hearing. His mother and father told the court they would do everything in their power to help their son. W.L.'s mother said she would "do all my best to locate programs to rehabilitate him and if I can't find any program available due to the conditions in the world right now,

9

I'll do my best to take him to church and to follow a model from the church, from the pastor."

Toward the end of the hearing, W.L.'s attorney asked the probation officer whether there were any sex offender treatment classes that the department currently used for other inmates. The officer responded that she worked on the juvenile side of the department and could not speak on behalf of anyone over age 18, but she was aware the department utilized one program in Eureka, Narum & Associates, which worked primarily with adults and employed an intensive intake process to decide if the program was appropriate for the applicant. However, the program operated solely on an outpatient basis and would not provide services to incarcerated offenders.

The probation officer concluded, "Here we are with somebody who is 22 years old and we are looking at rehabilitation and how do we do that under juvenile court . . . . And I can't speak on behalf of programming because there aren't any. [¶] DJJ offers the best programming source for sex offenders. They have a very thorough program."

The prosecutor emphasized that no sex offender counseling for incarcerated adults was available in the county, and that releasing W.L. into the community without "having substantial treatment under his belt would be a problem."

The court agreed with the prosecutor and the department. In a detailed ruling from the bench, it observed that "we sit here today in probably one of the most impoverished counties that has a lack of services for sex offender treatment.

10

"Fortunately [W.L.] has been given a chance by the California State Legislature to rehabilitate and that's why he is here. So to answer the parents' concerns, he has the opportunity to rehabilitation, the problem is what is available in this county? And throughout the years since I have been here it's gotten worse and worse as the county has gotten more impoverished.

"I'm aware of Narum & Associates, but they recently retired. There are new folks that have taken over. I have no idea. And they have not accepted any juvenile clients that I'm aware of. And that's a problem that has not been discussed. And I have not had anyone go through the program because of these issues. And Covid on top of all of it, they have been essentially shut down. I'm aware that they're not an accelerated program, nor intensive. They meet once a week.

"And here, due to this delay, I have a young man that needs treatment. He is 22. And the hold is listed at 25, which means he needs to get treatment in an accelerated quick manner.

"It appears to me that the only viable programming that we have in this community is DJJ. I looked at it. And I have read the documents provided. They are an extremely intensive, full-time program, literally every day as opposed to once every other week or once a week for an hour, which is what Narum & Associate does, a one-hour, once-a-week program. And they are designed to handle people who have yet to come to terms with what's occurring, designed to handle even the youth predators or whatnot. And they are given their own caseworker and specialist and they have three psychs on staff, given an opportunity to go to

11

junior college, trade schools, construction, computer coding, software training, etcetera.  They provide a reentry program as well as heavy substance-abuse programming.

"It seems like that's the only option that is left to the Court at this juncture because I don't know if Narum & Associates would approve of [W.L.] as we sit here now, eight months after the finding that he is an appropriate candidate.  Things might have been better if this had proceeded forthwith and quicker before the retirement of Narum & Associates, Gil Narum, back in June or before that.

"Here I am left with very little options and I want [W.L.] to be rehabilitated which is the goal of the juvenile court, not punishment.  And there are many youngsters that can work the program quick and some don't.  But one way or the other, [W.L.] should be afforded the opportunity to rehabilitate and reintegrate into society."

The court committed W.L. to the DJJ with a maximum term of imprisonment of 25 years.  The court and parties acknowledged he would be released by age 25 or sooner.  W.L. filed a timely notice of appeal.

## DISCUSSION

W.L. contends the juvenile court abused its discretion by committing him to the DJJ without considering less restrictive placements.  The record contains substantial evidence that no appropriate less restrictive rehabilitation programs were available, so we affirm.

**Legal Principles**

"The purpose of juvenile delinquency laws is twofold:  (1) to serve the 'best interests' of the delinquent ward by providing care, treatment, and guidance to rehabilitate the ward and 'enable him or her to be a law-abiding and productive member of his or her family and the community,' and (2) to 'provide for the protection and safety of the public . . . .' (Welf. & Inst. Code, § 202, subds. (a), (b) & (d); [citations].)." (*In re Charles G.* (2004) 115 Cal.App.4th 608, 614–615.)

"The appellate court reviews a commitment decision for abuse of discretion, indulging all reasonable inferences to support the juvenile court's decision.  [Citations.]  Nonetheless, there must be evidence in the record demonstrating both a probable benefit to the minor by a [DJJ] commitment and the inappropriateness or ineffectiveness of less restrictive alternatives.  [Citations.]  A [DJJ] commitment may be considered, however, without previous resort to less restrictive placements" (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396), and the juvenile court may properly consider a restrictive commitment as a means of protecting the public safety.  (*In re Carlos J.* (2018) 22 Cal.App.5th 1, 6.)  Moreover, " 'if there is evidence in the record to show a consideration of less restrictive placements was before the court, the fact the judge does not state on the record his consideration of those alternatives and reasons for rejecting them will not result in a reversal.' " (*In re Nicole H.* (2016) 244 Cal.App.4th 1150, 1159.)

13

**Analysis**

In the present case, W.L. does not claim that evidence of probable benefit to him from a DJJ commitment is lacking. Rather, he argues only that there is insufficient evidence to show the court considered and rejected less restrictive alternatives. We disagree. Preliminarily, the record contradicts W.L.'s apparent position that there was no evidence the DJJ commitment was justified as a means of protecting the public safety. Upon remand from this court, the juvenile court found in light of the nature of the crime and W.L.'s lack of insight that the public safety required his continued confinement pending the transfer hearing. That finding is amply supported by the record. It is undisputed—W.L., his mother and his attorney all agree— that five years after the offense, W.L. proclaimed his innocence and that the victim "was enjoying it." W.L. sought to be released on probation into the custody of his mother, who blamed the victim for the events, and his father, who offered no proposal for a treatment program.

As noted above, W.L.'s expert acknowledged that his failure to accept responsibility for raping the victim "which contributes to problems in remorse and empathy related to the offense" presented a risk factor for reoffense. The severity of W.L.'s offense and his complete denial of responsibility for his actions, neither of which had changed in the interim, equally support a finding that a restrictive DJJ commitment remained necessary to protect the public safety during his rehabilitation. (See *In re Shaputis* (2011) 53 Cal.4th 192, 218 [presence or absence of

14

insight, including remorse, is a significant factor in determining whether there is a rational nexus between dangerous past behavior and the threat of reoffense].)

While these considerations adequately support the juvenile court's disposition choice, the record also supports the determination that no appropriate, less restrictive programs were available. Although W.L. asserts that there is no evidence that "less restrictive alternative placements were considered and rejected," the assertion ignores the record. The department believed W.L. needed to complete a comprehensive sex offender program before he could be considered rehabilitated and returned to the community, and the DJJ program was the "most adequate" place for that. Further, W.L. was ineligible for any short-term residential sexual offender treatment programs, and the prosecutor advised the court that there were no group homes available for sex offenders over age 18. Although the department had occasionally utilized the Narum & Associates program, which worked primarily with adults, that program had been "essentially shut down" due to the pandemic, offered only out-patient treatment an hour a week, and would not provide even that to incarcerated offenders. Finally, defense counsel reported that he and W.L.'s brother searched extensively for alternative programs W.L. could attend if the court ordered probation, but found nothing.[2]

---

[2] All of this, we observe, is sadly consistent with the juvenile court's observation that Del Norte County has a dearth of services for sex offenders.

15

In this regard, W.L.'s reliance on *In re N.C.* (2019) 39 Cal.App.5th 81, 88, is unpersuasive. There, the juvenile court considered placing the minor in several alternative programs and explained why it found each one inadequate. Here, the information from the department, the prosecution, and W.L. confirmed that the county simply had no adequate alternatives to the DJJ for an offender with W.L.'s rehabilitative needs. The juvenile court was not required to locate an appropriate treatment program or to evaluate unavailable juvenile sex offender programs.

W.L. argues that a less restrictive, presumably community-based, placement would have allowed him to benefit from being closer to his large, supportive family; that he had tested low on a juvenile sexual offense recidivism risk assessment tool; and that he had already served significant time in prison "where he willingly participated in numerous programs for self-improvement." The family with whom he proposed to reside included a mother who blamed the rape on the victim and parents who could not identify any appropriate treatment, and—if none could be found—would take him to church. And the self-improvement programs had not modified his view that the victim participated willingly in sexual intercourse with three strangers.

As observed in *In re N.C., supra,* 39 Cal.App.5th at p. 87, "conflicting evidence . . . does not render the juvenile court's commitment order an abuse of discretion or warrant its reversal. As stated above, our role on appeal is to determine whether the

16

juvenile court's order is reasonably grounded in the record, not to reweigh the evidence in the record." We conclude that it is.

W.L. also asserts, for the first time on appeal, that the court erred by failing to consider programs designed for adult rather than juvenile offenders or located outside of Del Norte County. We will not address those claims because W.L. forfeited them by failing to raise them in the juvenile court, where they could have been addressed. (See *In re Travis W.* (2003) 107 Cal.App.4th 368, 379 [failure to object to defects in the probation report]; *In re Dakota S.* (2000) 85 Cal.App.4th 494, 501–502 [failure to object to absence of statutorily required assessment of a prospective guardian]; *People v. Welch* (1993) 5 Cal.4th 228, 234–235 [failure to object to errors or omissions in probation report or conditions].)

Indulging all reasonable inferences to support the juvenile court's decision, we conclude it reasonably determined there were no appropriate less restrictive alternatives to a DJJ commitment.

## DISPOSITION

The disposition order is affirmed.

17

_____

Ross, J. *

WE CONCUR:

_____

Pollak, P.J.

_____

Streeter, J.

A160886 *People v. W.L.*

_____

&ast; Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.