Filed 2/20/25  In re J.G. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re J.G., a Person Coming Under the Juvenile Court Law. | C100609 |
| THE PEOPLE, | (Super. Ct. No. JV141674) |
| Plaintiff and Respondent, | |
| v. | |
| J.G., | |
| Defendant and Appellant. | |

The juvenile court committed J.G. to the Sacramento County Secure Youth Treatment Facility, Valley Oak Youth Academy (VOYA) (Welf. & Inst. Code, § 875, subd. (a)).[1]  J.G. now contends the juvenile court abused its discretion when committing him to VOYA.  His complaints focus on whether less restrictive placements were considered and available, as well as whether he would benefit from treatment at VOYA.

---

[1]     Undesignated section references are to the Welfare and Institutions Code.

We conclude substantial evidence supports the juvenile court's decision and therefore will affirm the judgment.

BACKGROUND

*The Initial Proceedings and Supervision Efforts*

In February 2022, the People filed an amended wardship petition (the 2022 car theft petition) alleging that J.G. (then 14 years old) stole a 2009 Toyota Scion (Veh. Code, § 10851, subd (a); count one), unlawfully received, concealed, sold, withheld, and aided in concealing, selling and withholding the same vehicle (Pen. Code, § 496d, subd. (a); count two), drove that vehicle in a willful and wanton manner endangering persons and property while evading authorities (Veh. Code, § 2800.2, subd. (a); count three), and resisted arrest (Pen. Code, § 148, subd. (a)(1); count four). J.G. was detained in juvenile hall.

J.G. resolved the 2022 car theft petition in March 2022 by admitting to the auto theft and evading counts. In exchange, the remaining counts were dismissed in the interest of justice, he was adjudged a ward of the court, credited with time served, and released to the care and custody of his mother under specified terms of probation, including that he serve 30 days on electronic monitoring. The factual basis for his plea was that he took his mother's car without permission, fled from law enforcement in a high-speed chase that included driving twice into opposite lanes of traffic, and ultimately collided with a building and fled on foot.

A subsequent wardship petition filed on June 16, 2022, alleged that in January 2022, (before the first wardship petition), J.G. committed an assault with force likely to cause great bodily injury (Pen. Code, § 245, subd. (a)(4)) against Thomas W.[2] (the 2022 assault petition). A warrant was issued for J.G.'s arrest, and he was booked into juvenile

---

[2]     To protect his privacy, we refer to the victim by first name and last initial. (Cal. Rules of Court, rule 8.90(b)(4).

hall the same day. Two days later, J.G. was released to his mother under electronic monitoring with a condition that he be booked back into juvenile hall on the first violation of any condition.

Just over a week later on June 30, 2022, the probation department filed a request to modify J.G.'s custody status after he left his home without permission for over 90 minutes in the middle of the night. The juvenile court granted this request and detained J.G., placing him in juvenile hall. The next week, J.G. was again released to electronic monitoring at his mother's home. On August 2, 2022, J.G. was downgraded to home supervision, and at the end of the month, his home supervision ended.

J.G. then failed to appear for court hearings on September 26 and October 14, 2022, and the juvenile court issued a warrant for his arrest. J.G. was arrested several days later at the probation office, and he was released into his mother's custody the next day following an explanation for his nonappearances.

J.G. failed to appear for his next two court hearings on November 8 and 18, 2022, and the juvenile court again issued a warrant for his arrest. J.G. was not arrested until December 18, 2022, and the juvenile court released him two days later to his mother on electronic monitoring on the condition that he be booked into juvenile hall on his first violation of any condition.

Less than two weeks later, the probation department filed a motion to modify custody status alleging that J.G. violated his probation by using and possessing marijuana as detected during a home visit, and he was detained in juvenile hall.

On January 20, 2023, J.G. resolved the 2022 assault petition by admitting he committed the reasonably related charge of battery with serious bodily injury (Pen. Code, § 243, subd. (d)). The factual basis for his plea was that he struck the victim, Thomas W., threw him to the ground, and then beat him with a scooter causing great bodily injury. J.G. was continued as a ward of the court and released into his mother's care with specified terms and conditions.

3

*The June 2023 Violation of Probation Petition, Home Invasion Petition, and Home Invasion Violation of Probation Petition*

A probation violation petition (VOP) filed June 30, 2023, alleged numerous violations of probation occurring in May and June 2023, including that J.G. was suspended from school, used marijuana, left and stayed away from home without permission, and removed his electronic monitor (the June 2023 VOP petition). The juvenile court issued a warrant for J.G.'s arrest.

Another wardship petition was filed on August 31, 2023, based on the August 29, 2023, home invasion of J.G.'s grandfather's residence and related crimes (the home invasion petition). The petition alleged J.G. committed robbery (Pen. Code, § 211; count one), burglary (Pen. Code, § 459; count two), and assault with force likely to cause great bodily injury (Pen. Code, § 245, subd. (a)(4); count three) and further alleged gun use enhancements (Pen. Code, § 12022, subd. (a)(1)) and that the victim was elderly (Pen. Code, § 667.9, subd. (a)). J.G. was arrested and detained in juvenile hall. A corresponding petition for violation of probation was filed on September 1, 2023 (the home invasion VOP petition), with additional counts for burglary (Pen. Code, § 459; count four), attempted robbery (Pen. Code, §§ 664/211; count five) and resisting arrest (Pen. Code, § 148, subd. (a)(1); count six).

The original home invasion VOP petition was superseded by a petition including allegations that J.G. failed to obey the probation condition that he obey all laws by: (1) on or around August 29, 2023, committing robbery, burglary, and assault (counts one, two, and three); (2) on or around August 29 or 30, 2023, committing attempted robbery, residential burglary, and resisting arrest (counts four, five, and six); and (3) on or around August 15, 2023, committing burglary (count seven). Gun use and elderly victim enhancements were associated with at least some of these allegations.

The final version of the home invasion petition was filed on December 7, 2023, and alleged J.G. (then 15 years old) committed first degree robbery (Pen. Code, §§ 211,

213, subd. (a)(1)(A); count one), burglary (Pen. Code, § 459; count two), and assault by means of force likely to cause great bodily injury (Pen. Code, § 245, subd. (a)(4); count three). The petition further alleged a gun use enhancement (Pen. Code, § 12022, subd. (a)(1)) as to all counts and an elderly victim enhancement (Pen. Code, § 667.9, subd. (a)) as to counts one and two.

On January 8, 2024, J.G. (then 16 years old) resolved most of these matters by admitting all allegations in the home invasion petition and counts four through seven of the home invasion VOP petition. The remaining counts from the home invasion VOP petition were dismissed, and the resolution of the June 2023 VOP petition trailed to the contested disposition hearing.

*The Contested Disposition Proceedings*

A.      *The Probation Department's Social Study Report*

The probation department's social study report recommended a VOYA commitment. Following J.G.'s placement on probation in March 2022, he was referred by the Juvenile Justice Diversion Treatment Program (JJDTP) to River Oak Center for Children to receive services to address poor decision-making, anger management, substance abuse, and "communication within the home." However, J.G.'s adjustment to probation was poor, as set forth at length therein. J.G. was one to two years behind in high school, and while he had an individualized education plan (IEP) for "Other Health Impairment," he attended general education classes with support for his inattention.[3] Moreover, since entering juvenile hall, J.G.'s behavior had been mixed. For example, he failed to consistently earn daily behavior points and received write-ups for noncompliance but did participate in programs such as the Boys and Girls Club, gang

---

[3]      According to J.G.'s mother, J.G. had been diagnosed with attention deficient hyperactivity disorder (ADHD) and authoritative oppositional defiant disorder for which he had previously refused to take medication.

5

awareness prevention, and church.  J.G.'s risk to reoffend was "[v]ery [h]igh" with seven high-need areas identified and one moderate-need area, although his mother's supportiveness was noted as a family strength.

The social study report also contained an extensive, although generalized, description of the available services at VOYA, including, therapeutic services, cognitive behavioral interventions for substantial abuse, mental health treatment, and educational/vocational services.  Upon admission to VOYA, assessments would identify J.G.'s specific needs and strengths in specified areas, thus dictating his course of treatment.  Interventions previously attempted with J.G. included juvenile hall, electronic monitoring, waiver in lieu of a violation of probation, and the JJDTP.  However, J.G.'s misbehavior continued to escalate, demonstrating that he required "a more intensive and structured level of supervision and treatment."  J.G.'s case was "administratively staffed" and a commitment to VOYA was recommended.

B.     *The People's Pre-Disposition Brief*

Prior to the contested disposition hearing, the People filed a brief advocating that J.G. be committed to VOYA with a baseline term of four years.  Included with this recommendation was an analysis of the relevant factors of section 875, subdivision (a)(3).

As to the severity of the offense, J.G. committed offenses against his aging grandfather who suffers from Parkinson's disease, first on August 15, 2023, and then again on the night of August 29, 2023, thus demonstrating his need "for serious rehabilitative intervention to address issues of empathy, poor decision making, and violent behavior."  On August 15, 2023, J.G. and other individuals tried to remove a gun safe from the grandfather's house while his grandfather was in the shower.  Then just before midnight on August 29, 2023, J.G. and four or five co-assailants entered his grandfather's bedroom wearing ski masks; two were armed with AR-style rifles.  J.G. demanded, " 'Give me your God damn code to your gun safe.' "  J.G.'s grandfather tried to grab his .38-revolver (which was in a holster) from under his pillow to defend himself

6

but was hit twice as the assailants wrestled the gun away from him. They also stole a brown leather handgun pouch and a pellet handgun. The assailants also entered Y.D's[4] bedroom, ransacking the room and screaming at Y.D. not to move. Shortly thereafter, authorities spotted a stolen car with four occupants and attempted unsuccessfully to stop the car, resulting in a high-speed chase that ended when the occupants abandoned the car on the Yolo causeway. Three of the four suspects jumped from the pedestrian bridge, and the remaining individual surrendered at gunpoint. The three fleeing occupants, including J.G., were ultimately detained following a search of a local field. An AR-15-style rifle, and multiple items taken during the home invasion were found in the abandoned car. J.G.'s grandfather's .38-revolver was also recovered in a search.

As to previous attempts at rehabilitation and J.G.'s performance on probation, the People argued his behavior had not improved in response to therapeutic services and electronic monitoring and instead had escalated. J.G. became a ward of the court in March 2022, at age 14, for felony car theft and evasion of a police officer. The next month, probation officers recovered four replica firearms from J.G.'s bedroom, and he was counseled without the filing of a VOP petition. In June 2022, probation asked that J.G. complete 12 days of electronic monitoring in response to his failure to comply with curfew. Later that month, J.G. was arrested for an assault that had occurred in January 2022, wherein J.G. hit another minor at school on the face and head and then struck him on the back with a metal scooter. He was placed on electronic monitoring in July 2022 after he left his home without permission and possessed a replica firearm. In November 2022, J.G. failed to appear for court, resulting in the issuance of a bench warrant, and the next month he was discharged from the JJDTP for failing to actively participate. In December 2022, J.G. was arrested on a bench warrant, released on electronic monitoring,

_____

[4] To protect her privacy, we refer to the witness by her initials. (Cal. Rules of Court, rule 8.90(b)(10), (11). Y.D. was the caretaker for J.G.'s grandmother.

7

and then arrested for using and possessing marijuana and paraphernalia. He then resolved the pending assault petition by admitting a lesser offense and was continued on probation. In May 2023, the minor received additional electronic monitoring for threatening his mother. The next month, J.G. violated his probation by testing positive for THC during a probation visit, followed by threats to his mother, cutting off his ankle monitor, and leaving home without permission resulting in the issuance of a warrant for his arrest. In August 2023, the JJDTP again discharged J.G. because his whereabouts were unknown, and he had an active warrant. He remained away from home with an active warrant until he was taken into custody on August 30, 2023, following the crimes committed against his grandfather.

As to J.G.'s rehabilitative needs, the People argued that J.G. "needs rehabilitation services and treatment to address his violent, criminal mindset and potential gang issues" which could be addressed by VOYA's therapeutic services as described in the probation department's November 2023 report. These included "cognitive behavioral interventions for substance abuse, mental health treatment program, and prosocial programming." J.G. would also benefit from VOYA's education opportunities as he was one to two years behind in his high school education and could also participate in their vocational programs and college courses.

The People further argued that rehabilitation and community safety could not be met in a less restrictive alternative to VOYA. Releasing J.G. on electronic monitoring or a Level A placement would "place the community at great risk" and would not adequately address his need for "intensive rehabilitative programming to address his criminal mindset." Finally, at 16 years old, J.G. was of appropriate age for a VOYA commitment and no other evidence suggested such a commitment was unsuitable.

C.    *J.G.'s Pre-Disposition Brief*

J.G.'s pre-disposition brief argued against a VOYA commitment complaining that the probation department had failed to offer J.G. sufficient rehabilitative services and that

8

less restrictive rehabilitative alternatives were available. Analyzing the section 875, subdivision (a)(3) factors, J.G. conceded his offense was severe and had caused serious harm, but argued he was the youngest involved and fell victim to "peer influence and a failure to weigh risks and consequences." J.G. also acknowledged his previous delinquent history, but argued probation's efforts to rehabilitate him were inadequate. Moreover, the probation department's social study report failed to "articulate any specific, individualized treatment, programming, or education that [J.G.] needs and that can only be provided in VOYA." Further, J.G. argued the goals of rehabilitation and community safety could be met through J.G.'s proposed "community-based disposition." Finally, J.G. was only 15 years old when the offense occurred and had an IEP. Accordingly, J.G. requested the juvenile court adopt his proposed release plan to release J.G. to his mother with specified services.

D.     *The Contested Disposition Proceeding and Juvenile Court's Ruling*

The contested disposition hearing was held on January 31, 2024. At the outset, the juvenile court granted the People's motion to dismiss the June 2023 VOP petition in light of J.G.'s earlier plea. The People then read a statement from J.G.'s grandfather expressing that J.G. instigated and was responsible for what occurred, had wrecked his mother's only car two years earlier, had no conscience or respect, and "just does what he wants to do." J.G.'s letter to the court apologizing for his conduct and expressing a desire to change was admitted as defense exhibit A.

The People then argued in favor of a VOYA commitment as recommended by probation and the People's pre-disposition brief given J.G.'s poor adjustment to probation, high risk of re-offense, and escalating behavior that had increased in both violence and sophistication. J.G.'s decision to rob his elderly, sick grandfather of guns at gunpoint endangered not only the victim/community, but also J.G. himself. J.G. lacked empathy (despite his recent letter), and as the "ring leader," merited a VOYA commitment consistent with the dispositions of other minors involved.

9

J.G.'s counsel disagreed, arguing the recent legislative changes were intended to make commitments less frequent and that there was no evidence that J.G. was the "ring leader," although he did tell his friends about his grandfather's guns. Further, J.G. was not sophisticated, as he tried to steal a safe and move it with a dolly to a stolen car that was not capable of transporting it. J.G. was not identified as one of the individuals with a gun, but did punch his grandfather. Moreover, J.G. was not driving during the high-speed chase. As to rehabilitative efforts, J.G. argued that probation had not exhausted available treatment options, and J.G. had not been served by the use of waivers in lieu, electronic monitoring, and the JJDTP. Nor had his IEP for "other health impairments" been adequately addressed. Therefore, counsel concluded that J.G. should be released to his mother with services as proposed in J.G.'s release plan or alternatively to an out-of-home placement with a resource family or a short-term residential therapeutic treatment program.

The juvenile court asked J.G. to clarify how his proposed disposition of release to his mother with services from prior dispositions would differ from prior attempts at rehabilitation. J.G. argued it would be different because he would receive more services/support and had matured through aging and mentorship. The parties then addressed the selection of the baseline term if J.G. was committed to VOYA, which is not challenged here. Finally, J.G.'s mother addressed the court arguing her son wanted to change but had not received services (including for his authoritative oppositional defiant disorder and ADHD) due to wait lists, that one fight should not justify sending him to VOYA, and that his 21-year-old sister now lived in the home and would be available to help supervise him if released.

The juvenile court took a brief recess to review J.G.'s letter and then explained and announced its decision to commit J.G. to VOYA. Without specifically deciding whether J.G. was "the ring leader," the court determined J.G. was the reason the group committed the crimes at J.G.'s grandfather's home. Moreover, J.G. tried on two different occasions

10

to get the gun safe, the second of which involved assaulting J.G.'s grandfather in his bed, even if J.G. had not been wielding the AR-style guns. Further, J.G. had been a passenger in a car chase where the vehicles traveled in excess of 125 miles per hour. J.G.'s family was concerned about him, and he had not changed his behavior in response to previous probation intervention. The court then acknowledged possible shortcomings with probation's rehabilitation efforts but highlighted that its duty was to decide "whether or not community safety and rehabilitation can each be accomplished with a less restrictive disposition than the VOYA program." The court continued: "And based on the pattern of behavior that I have seen, based on the factors of the offense itself, based on the very high risk rating . . . what I perceive is escalating violence and aggression, I think that VOYA is necessary to protect community safety." The court set his baseline commitment at two years and found his maximum term of confinement was 11 years and eight months. The court also adopted the findings and orders as proposed by the probation department. A hearing to discuss the specifics of J.G.'s individual rehabilitation plan would occur on March 1, 2024.[5] J.G. timely appealed.

DISCUSSION

J.G. contends the juvenile court abused its discretion in committing him to VOYA, attacking the lack of findings concerning less restrictive alternatives and probable benefit, as well as the sufficiency of the evidence supporting these determinations. As we shall explain, we are unpersuaded.

A. *Legal Background*

Until recently, the Department of Juvenile Justice (DJJ) was "the state's most restrictive placement for its most severe juvenile offenders." (*In re Miguel C.* (2021)

---

[5] An individualized rehabilitation plan with updates on J.G.'s progress at VOYA is part of the record on appeal, but was not before the juvenile court at the time of disposition and is thus not summarized herein.

11

69 Cal.App.5th 899, 902.) DJJ was previously known as the California Youth Authority. (*Id.* at p. 906, fn. 4.) In 2020, the Legislature enacted juvenile justice realignment by passing Senate Bill No. 823 (2019-2020 Reg. Sess.) (Stats. 2020, ch. 337). Implementing the Legislature's juvenile justice realignment program required the eventual closure of DJJ and the transfer of its responsibilities to California counties. (§ 736.5, subd. (a).) The county-level equivalent of DJJ is a secure track commitment, also known as a secure youth treatment facility. (§§ 875, 875.5.)

Section 875, subdivision (a)(3) authorizes commitment to a secure youth treatment facility if a ward meets certain criteria and "[t]he court has made a finding on the record that a less restrictive, alternative disposition for the ward is unsuitable." The juvenile court must base its determination "on all of the following criteria: [¶] (A) The severity of the offense or offenses for which the ward has been most recently adjudicated, including the ward's role in the offense, the ward's behavior, and harm done to victims[;] [¶] (B) The ward's previous delinquent history, including the adequacy and success of previous attempts by the juvenile court to rehabilitate the ward[;] [¶] (C) Whether the programming, treatment, and education offered and provided in a secure youth treatment facility is appropriate to meet the treatment and security needs of the ward[;] [¶] (D) Whether the goals of rehabilitation and community safety can be met by assigning the ward to an alternative, less restrictive disposition that is available to the court[;] [¶] (E) The ward's age, developmental maturity, mental and emotional health, sexual orientation, gender identity and expression, and any disabilities or special needs affecting the safety or suitability of committing the ward to a term of confinement in a secure youth treatment facility." (§ 875, subds. (a)(3)(A)-(E).)

We review the juvenile court's commitment decision for abuse of discretion, indulging all reasonable inferences in support of the juvenile court's decision. (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396.) " 'A trial court abuses its discretion when the factual findings critical to its decision find no support in the evidence.' " (*In re*

*Khalid B*. (2015) 233 Cal.App.4th 1285, 1288.)  There is no abuse of discretion where the commitment is supported by substantial evidence.  (*In re Angela M., supra*, at p. 1396.)

      B.     *Analysis*

We discern no abuse of discretion.  First, there is no indication in the record that the juvenile court failed to consider the section 875, subdivision (a)(3) factors when reaching its decision to order a VOYA commitment.  Rather, the court considered the probation department's report, the parties' briefs, as well as statements from the victim, J.G.'s mother, and J.G.  These materials included a discussion of the application of section 875, subdivision (a)(3)'s factors, including whether less restrictive placement alternatives were available and whether J.G. would benefit from a commitment to VOYA.  Moreover, the juvenile court adopted the probation department's recommended findings and orders, including that the court had considered each of the section 875, subdivision (a)(3)(A)-(E) factors.  Accordingly, J.G. has not shown the juvenile court did not consider these factors in reaching its suitability determination, and we presume the juvenile court understood and applied applicable law.  (*In re Julian R*. (2009) 47 Cal.4th 487, 498-499.)

J.G. nonetheless argues the juvenile court abused its discretion because it failed to expressly consider whether less restrictive alternatives, other than the options presented to it—VOYA or a return to J.G.'s mother—might have been suitable.  It is axiomatic that the juvenile court is under no obligation to *speculate* regarding placement options not presented to it, and thus, the court did not abuse its discretion in failing to consider other alternatives.  Nor was the juvenile court required to attempt all less restrictive placements prior to ordering the VOYA commitment.  (See, e.g., *In re M.S.* (2009) 174 Cal.App.4th 1241, 1250 [juvenile court is not required to attempt all less restrictive placements prior to sending a minor to the DJJ].)

Further, we find substantial evidence supports the trial court's commitment determination.  J.G.'s commitment offenses were extremely serious and J.G.'s previous performance on probation was poor as set forth at length above.  J.G. had been in his

13

mother's care on electronic monitoring when he cut off his ankle monitor, absconded, and then attempted to steal his 74-year-old grandfather's gun safe. Following the first attempt, J.G. returned, masked with multiple individuals wielding AK-47 firearms to force J.G.'s sleeping grandfather to give them the combination to the gun safe, beating him in the process. Reflective of the seriousness of this and J.G.'s poor prior performance on probation, he scored "[v]ery [h]igh" on probation's risk assessment, and at age 16 was old enough to benefit from VOYA's programs. Under these circumstances, the juvenile court's determination that "community safety and rehabilitation" could not be accomplished in a less restrictive environment, i.e., another return to his mother's care, is thus supported by substantial evidence.

Finally, J.G. challenges the finding that he would likely benefit from a VOYA commitment. However, as highlighted by the probation department's report and the People's brief, J.G. was one to two years behind in high school with an IEP but being taught within the general education students. He also failed to meaningfully participate in prior referrals to the JJDTP at River Oak Center for Children for services to address poor decision-making, anger management, substance abuse, and "communication within the home" resulting in his termination from that program on two different occasions. A VOYA commitment offered access to various programs including behavior treatment interventions, cognitive behavior interventions for substance abuse, the ability to obtain a high school diploma, postsecondary education opportunities, and vocational programs. J.G. has not established these programs would not assist in his rehabilitation through the treatment of his poor decision-making, anger management, substance abuse, and communication skills.[6] Accordingly, substantial evidence supports the juvenile court's

---

[6] J.G.'s argument concerning his need for treatment of unspecified trauma in his past does not avail him. According to the probation department's social study report, J.G. denied having experienced any trauma in his life, although the report identified J.G.'s

14

implied finding that J.G. would benefit from a VOYA commitment wherein he could participate in educational and therapeutic opportunities aligned with his previously identified needs.

## DISPOSITION

The judgment is affirmed.

_____\s_____,
Krause, J.

We concur:

_____\s_____,
Hull, Acting P. J.

_____\s_____,
Mesiwala, J.

---

exposure to domestic violence in his living situation. Assuming the trauma being referenced is J.G.'s exposure to domestic violence, J.G. did not present any evidence suggesting this trauma could not be addressed through VOYA's mental health treatment program.